Argued and submitted January 14, order of circuit court affirmed June 25, 2009

# STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

# RICARDO SERRANO,
*Defendant-Respondent.*

## (CC C063227CR; SC S056399)

210 P3d 892

Paul L. Smith, Assistant Attorney-in-Charge, Criminal Appeals, argued the cause for plaintiff-appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General, Salem.

Joshua B. Crowther, Senior Deputy Public Defender, argued the cause for defendant-respondent. With him on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services, Salem.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

This case concerns the meaning of several sections of Oregon Evidence Code (OEC) 505, which governs marital privileges in Oregon. Defendant was charged with multiple counts of aggravated murder, involving three victims. Defendant's wife agreed to testify for the state regarding certain communications between defendant and wife that had occurred both before and after the murders. Although it is not entirely clear from the record, it appears that the state sought to offer wife's testimony regarding those communications as some evidence that defendant had had a motive to commit the murders and then had attempted to conceal his involvement in them. Before trial, defendant filed a motion *in limine*, in which he asserted the marital communications privilege as to those communications. The trial court granted defendant's motion and excluded the communications now at issue. The state filed this expedited appeal pursuant to ORS 138.060(2)(a).[1] For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

For purposes of this appeal, the undisputed facts are taken from the record and the parties' briefs. Defendant is charged with the aggravated murders of Melody Dang and her two young sons. At the time of the murders, defendant's wife (wife) was having an affair with Dang's long-time boyfriend, Nguyen, and was pregnant with Nguyen's child.

By late summer 2006, wife decided that she wanted to leave defendant and dissolve their marriage. She shared her plans to leave defendant with a "few friends," her mother and two sisters, and three or four coworkers. Wife also discussed with at least one of her sisters how she should tell defendant. On September 1, 2006, wife moved out of the family home, took the couple's five children with her, and moved in with one of her sisters. Wife left defendant a page-long note, in which she told him that she was leaving him and moving out of the house.

---

[1] Under ORS 138.060(2)(a), when the defendant is charged with murder or aggravated murder and a trial court enters a pretrial order suppressing evidence, the state may appeal that order directly to this court.

On the night that wife moved out, defendant called wife on her cell phone. At that time, wife was in her sister's living room. Wife's sister was in the room while wife spoke with defendant; however, she heard only wife's side of the conversation. Wife reiterated that she wanted a divorce. Wife testified that, during the telephone call, defendant expressed a desire to reconcile with her.

Approximately one week later, wife left another note for defendant, informing him that she had had an affair. By the time that wife left the second note, she already had told her mother and sisters about the affair and had talked with them about how she should tell defendant.

Defendant called wife again after reading the second note. During that conversation, they discussed her affair. In another conversation that evening, she also told defendant, for the first time, that she was pregnant and that defendant probably was not the child's father. According to wife, defendant responded that her pregnancy did not matter, that she should not tell anyone, and that he would raise the child as his own. However, wife told defendant that she already had spoken to the baby's father about the baby.[2] Wife's sister also was present during that call, but again heard only wife's side of the conversation.

At some point after wife moved out of the family home, defendant called Brandi Preciado, with whom he had had an intermittent intimate relationship, and told her that wife had moved out. Preciado and defendant later met in person. Defendant told Preciado that he and wife had split up and that wife had taken the children and moved in with her sister.

After defendant's second telephone call with wife, but before November 2, 2006, wife moved back into the family home with defendant, because her sister did not have enough space for wife and the children. Wife told defendant that she did not want to reconcile with him and that the living arrangement would continue only until she could find her own place.

---

[2] It is unclear whether, in that communication, wife identified the baby's father as Nguyen.

The state contends that the murders occurred on the evening of November 2, 2006. Nguyen, who worked the night shift, discovered the bodies of Dang and their two sons the following morning when he returned home. Nguyen later reported to the police that the only property missing from the house was a laptop computer. That same morning, defendant called wife at 5:35 a.m. as she was coming home from work. Defendant worked a day shift and typically watched the children at home in the evening while wife worked a night shift. He routinely called her to make sure that she was on her way home from work before he left for work in the morning. Based on their conversation that morning, wife thought that defendant was "[o]n his way to work."

Wife arrived home approximately ten minutes after the telephone call and noticed that one of defendant's trucks was not in the driveway. She called him several times to ask him about the truck, but he did not answer his phone. Defendant called wife back approximately 30 minutes later and explained that he had not been able to answer his phone because it had been left in his jacket, which was in the back seat. She asked defendant about the missing truck, and defendant explained that it had broken down the night before when he went to the store and that it was parked a few blocks away from the house. Before ending the call, he told her that he was walking into work and had to hang up.

Approximately one week after the murders, defendant told wife that he had lost his cell phone while shopping. That conversation took place while they were at home with their children. Then, in mid-November 2006, defendant told wife that he knew someone who was selling a laptop computer and asked her if she wanted to buy it. Wife told him that she did not want the computer.

On November 28, 2006, Washington County Sheriff's Detective Hays interviewed defendant as a suspect in the murders. During the interview, defendant told Hays that he had lost his cell phone approximately two weeks earlier near the local WinCo store. Defendant also told Hays that his truck was parked a few blocks away from his house because it had broken down. Police arrested defendant on November 29, and he was later charged with ten counts of

aggravated murder. Wife moved out of the family home on the same day.

Preciado remained in contact with defendant after he was arrested, and, at some point, defendant told her that wife was pregnant. Preciado testified that she initially thought that wife was pregnant with defendant's baby. However, she later discovered that defendant was not the father. When she confronted defendant about it, he eventually told Preciado that he did not believe that the baby was his.

Wife agreed to testify for the state about certain communications that she had had with defendant before and after the murders. Before defendant's scheduled trial, he filed a motion *in limine*, asserting the marital communications privilege set out in OEC 505(2) as to those communications. Specifically, defendant argued that the marital communications privilege required the court to exclude, among other things, the following evidence from defendant's trial: (1) the note that wife had left for defendant, telling him about her affair; (2) the conversation between defendant and wife in which they had discussed her affair and in which she had told him that she had become pregnant as a result of the affair; and (3) the November 3, 2006, conversation in which defendant had told wife that he was on his way to work.[3] Defendant contended that OEC 505(2) applied because those communications had occurred between defendant and wife outside the presence of others and had involved intimate matters. Defendant also asserted that no evidence suggested that either spouse had intended those communications to be disclosed to others or that defendant had waived his privilege as to those communications.

The state opposed defendant's motion. The state contended that the communicating spouse's intent governed the confidentiality of a marital communication and that the communications at issue were not protected by the marital communications privilege because neither defendant nor wife

---

[3] Defendant's motion initially identified the communications as we have described. However, the evidence at the hearing established that wife had written two notes on different occasions and established the full extent of the content of the various communications that we analyze below.

had intended their statements to be "confidential communications" within the meaning of OEC 505. The state further asserted that, even if defendant and wife initially had intended their communications to be confidential, they later waived the privilege because the purpose of the privilege—preserving marital harmony—was no longer achieved, given that defendant and wife's marriage was in a state of disrepair. Relatedly, the state contended that communications regarding the dissolution of a marriage are not privileged. The state also argued that defendant would "get a windfall" by asserting the privilege based on a marriage that was barely intact.

The trial court held two hearings on defendant's motion. Wife, Detective Hays, and Preciado testified. In a July 2008 letter opinion, the court granted in part and denied in part defendant's motion. As an initial matter, the trial court rejected the state's argument that communications regarding the dissolution of a marriage were not confidential. The trial court concluded that the notes that wife had left for defendant and that defendant's side of the subsequent telephone conversations between defendant and wife were confidential communications falling within the scope of the marital communications privilege. The trial court further concluded, however, that wife's side of those conversations—which her sister had overheard—were not confidential. Finally, the trial court concluded that the November 3, 2006, telephone conversations between defendant and wife, in which defendant had stated that he was on his way to work and that his truck had broken down, were confidential and within the scope of the privilege. The trial court did not specifically address defendant's later conversations with wife concerning the loss of his cell phone or the purchase of a laptop computer. Rather, the trial court concluded that "[a]ll other communications between the defendant and his wife * * * are privileged and not admissible[.]" The trial court did not address defendant's communications with Detective Hays. The court issued an omnibus order in August 2008, which reflected its earlier letter opinion. The state timely appealed pursuant to ORS 138.060(2)(a).

## II. DISCUSSION

### A. *Background - OEC 505 and OEC 511*

The state's appeal requires that we interpret several statutory provisions involving the marital privileges set out in OEC 505, specifically, OEC 505(1)(a) and (b), which define the terms "confidential communication" and "marriage"; OEC 505(2), which establishes the marital communications privilege; and OEC 505(4), which sets out exceptions to the marital privileges. We also must consider OEC 511, which governs waiver of privileges by voluntary disclosure. We first examine the statutory text and context when interpreting a statute. *See State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009) (the first step for interpreting a statute "remains an examination of text and context").

We begin with a brief overview of the marital privileges. Two marital privileges exist in Oregon: the marital communications privilege, which is governed by OEC 505(2), and the testimonial privilege, which is governed by OEC 505(3).[4] OEC 505(2) provides:

> "In any civil or criminal action, a spouse has a privilege to refuse to disclose and to prevent the other spouse from disclosing any confidential communication made by one spouse to the other during the marriage. The privilege created by this subsection may be claimed by either spouse. The authority of the spouse to claim the privilege and the claiming of the privilege is presumed in the absence of evidence to the contrary."

OEC 505(3) provides:

> "In any criminal proceeding, neither spouse, during the marriage, shall be examined adversely against the other as to any other matter occurring during the marriage unless the spouse called as a witness consents to testify."

The marital privileges are distinguishable from each other in several ways. Laird C. Kirkpatrick, *Oregon Evidence*

---

[4] The testimonial privilege is sometimes referred to as the privilege against adverse spousal testimony.

§ 505.03[1], 366 (5th ed 2007). In particular, the marital communications privilege applies to only confidential communications between the spouses made during the marriage, while the testimonial privilege applies to nonconfidential communications *and* observations made during the marriage. *Id.* Both spouses hold the marital communications privilege, and both may assert that privilege during, and after, the marriage. *Id.* By contrast, only the spouse called to testify holds the testimonial privilege, and that privilege may be asserted only during the marriage. *Id.* Finally, the marital communications privilege may be asserted in civil and criminal cases, but the testimonial privilege may be asserted in criminal cases alone. *Id.*

Both the marital communications privilege and the testimonial privilege may be waived. OEC 511. OEC 511 governs waiver by voluntary disclosure of several kinds of privilege, including the marital privileges, and provides, in part:

> "[a] person upon whom [OEC 503 to 514] confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person * * * voluntarily discloses or consents to disclosure of any significant part of the matter or communication."

In this case, the testimonial privilege set out in OEC 505(3) is not at issue, because wife waived it when she voluntarily consented to testify for the state. The question is whether the trial court properly excluded wife's testimony about the contested communications based on the marital communications privilege set out in OEC 505(2). Having set out the framework for the marital privileges, we turn now to the parties' arguments.

B. *Statements Directed at Marital Dissolution*

We begin by addressing the state's argument that communications regarding the dissolution of a marriage should not be privileged because they do not further the historical purpose of the marital privileges, which is to preserve marriages. *See State v. Luper*, 49 Or 605, 607-08, 91 P 444 (1907) (purpose of privilege is "to secure domestic happiness and tranquility"). In light of that purpose, the state urges this

court to exclude categorically from the marital communications privilege purportedly confidential communications that are directed at the dissolution of the marriage. The state specifically contends that wife's communications to defendant before the murders should be admissible because their admission would not facilitate the historical function of the marital communications privilege, given that wife was intending to dissolve the marriage when she made the communications to defendant.

The issue is easily resolved by examining the text of OEC 505. As noted, OEC 505(2) provides that "a spouse has a privilege to refuse to disclose and to prevent the other spouse from disclosing *any confidential communication* made by one spouse to the other *during the marriage*." (Emphases added.) For the purposes of OEC 505(2), "confidential communication" and "marriage" are statutorily defined terms. OEC 505(1)(a), discussed further below, defines "confidential communication" as "a communication by a spouse to the other spouse and not intended to be disclosed to any other person." OEC 505(1)(b) defines "marriage" as "a marital relationship between husband and wife, legally recognized under the laws of this state."

In OEC 505(2), which defines the scope of the marital communications privilege, the legislature used the adjective "any" to modify the phrase "confidential communication." Thus, the privilege applies to "any"—not to some—"confidential communications," as long as those communications were made "during the marriage." Read together, those provisions demonstrate that the legislature intended to include within the protection of OEC 505(2) *all* confidential communications between spouses made throughout the entire course of the marriage, not merely communications that would or could contribute to the "health" of the marriage, as the state contends.

Moreover, in OEC 505(4), the legislature set out three specific exceptions to the marital privileges, but did not provide for any "marital health" exception. Under OEC 505(4), there is no privilege: (1) in criminal actions in which one spouse is charged with an offense against the other; (2) as to matters occurring before the marriage; or (3) in civil

actions where the spouses are adverse parties.[5] In our view, the omission of a "marital health" exception in OEC 505(4) is decisive. *See* ORS 174.010 (when construing statutes, court may not insert what legislature omitted).

■　In sum, the plain wording of OEC 505 demonstrates that the legislature intended the existence of a legal marriage to establish the scope of the protection provided by the marital communications privilege. Assuming that the party asserting the privilege can establish that the other requirements of OEC 505 have been satisfied, the marital communications privilege in OEC 505(2) applies as long as the statements were made while the marriage was legally intact. Accordingly, we conclude that the trial court properly declined to admit wife's testimony on that basis.

C. *Confidentiality of Marital Communications*

1. *Spousal Intent Governing the Communications*

We next consider whether, as the state contends, the communicating spouse's intent governs the confidentiality of a marital communication. To do so, we must consider the meaning of the term "confidential communication" as it is used in OEC 505(2). As noted, the legislature has defined "confidential communication" in OEC 505(1)(a), which provides that, as used in OEC 505,

" '[c]onfidential communication' means a communication by a spouse to the other spouse and not intended to be disclosed to any other person."

The state argues that the trial court erroneously excluded the contested communications because they were not "confidential communications" within the meaning of OEC 505(1)(a) and, therefore, were not subject to the marital

---

[5] OEC 505(4) provides:

"There is no privilege under this section:

"(a) In all criminal actions in which one spouse is charged with bigamy or with an offense or attempted offense against the person or property of the other spouse or of a child of either, or with an offense against the person or property of a third person committed in the course of committing or attempting to commit an offense against the other spouse;

"(b) As to matters occurring prior to the marriage; or

"(c) In any civil action where the spouses are adverse parties."

communications privilege. Specifically, the state asserts that the communicating spouse's intent governs the confidentiality of communications made between spouses and that neither defendant nor wife intended the communications at issue to be confidential. The state alternatively argues that, even if the contested communications were confidential, both defendant and wife waived their privilege as to those communications by disclosing the substance of the communications to others.

Defendant responds that the text and context of OEC 505(1)(a) indicate that the legislature intended that the intent of the spouse claiming the privilege—not the intent of the communicating spouse—governs the privilege's application. To support that assertion, defendant points out that OEC 505(1)(a) is expressed in the passive voice and contains no wording that limits its application to the communicating spouse. Defendant relies on the context of Oregon's other evidentiary privileges and the policy underlying the marital privileges as further support. Defendant alternatively contends that, even if the intent of the communicating spouse governs confidentiality, the circumstances surrounding the communications now at issue demonstrate that both defendant and wife intended their communications to be confidential.

As a preliminary matter, there is no question that the notes and conversations at issue qualified as "communications" for purposes of OEC 505(2) and OEC 505(1)(a). Neither is there any question that the communications occurred between spouses. The question is whether the communications were "confidential," that is, "not intended to be disclosed to any other person," OEC 505(1)(a). Because that pertinent part of OEC 505(1)(a) is written in the passive voice and does not identify the actor, it is initially unclear whose intent governs confidentiality for purposes of OEC 505(2): that of the communicating spouse, the noncommunicating spouse, or both spouses.

On at least one other occasion, this court has concluded that the use of the passive voice in statutory text is indicative of legislative intent. *See State v. Pena*, 345 Or 198,

207, 191 P3d 659 (2008) (noting that use of passive voice indicated that either lawyer or defendant could move for removal of judge). Here, however, the relevant statutory provisions and definitions shed no light on the question, and we do not think that the use of the passive voice in OEC 505(1)(a) necessarily reflects which spouse's intent governs confidentiality.

For further guidance, we turn to Oregon's other privilege rules, which serve as pertinent context. The Oregon Evidence Code establishes multiple evidentiary privileges that also define and use the term "confidential communication," including the lawyer-client, psychotherapist-patient, physician-patient, and clergy-penitent privileges. Although the term is tailored in each instance to the context in which those privileges may be invoked, the definitions are similar, because each defines "confidential communication" in the passive voice as a communication "not intended to be disclosed." *Compare, e.g.*, OEC 503(1)(b) (lawyer-client privilege); OEC 504(1)(a) (psychotherapist-patient privilege); OEC 504-1(1)(a) (physician-patient privilege); OEC 506(1)(a) (clergy-penitent privilege). In the psychotherapist-patient privilege context, this court has looked to the speaker's intent to determine whether a communication was intended to be confidential. For example, this court previously has concluded that the confidentiality of a patient's communication to his psychotherapist is determined in light of the patient's intent. *State v. Miller*, 300 Or 203, 210, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986).

However, relying on this court's interpretations of other privilege statutes is of limited value, because the other privileges do not operate in the same manner as the marital confidential communications privilege. Specifically, the client, the patient, or the penitent alone holds the privilege as to the lawyer-client, psychotherapist-patient, physician-patient, and clergy-penitent privileges. *See, e.g.*, OEC 503(2), (3) (lawyer-client privilege); OEC 504(2), (3) (psychotherapist-patient privilege); OEC 504-1(2), (3) (physician-patient privilege); OEC 506(2) (clergy-penitent privilege). Given the professional context in which those privileges exist, it makes sense that the client's intent controls whether a communication is confidential in those relationships. *See* Kirkpatrick,

*Oregon Evidence* § 503.06[1] at 308 ("Whether the communication is confidential depends upon the intent of the client."). By contrast, OEC 505(2) expressly provides that *both* spouses hold the confidential communications privilege. Because the text and context of OEC 505(1)(a) do not illuminate the present inquiry, we turn to legislative history for additional guidance. *See Gaines,* 346 Or at 171-72 (stating that court will consult legislative history after examining text and context, "even if [it] does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis").

The principal source of legislative history for the 1981 Oregon Evidence Code is the 1981 Conference Committee Commentary. Although that Commentary is not an official part of the Oregon Evidence Code, it nonetheless "provides highly useful background regarding each rule and guidance to courts and attorneys in interpreting these rules[.]" *State v. McClure,* 298 Or 336, 344, 692 P2d 579 (1984); *see also State ex rel OHSU v. Haas,* 325 Or 492, 506 n 10, 942 P2d 261 (1997) (examining Commentary as part of legislative history analysis). According to the 1981 Conference Committee Commentary to OEC 505(1)(a),

> " '[c]onfidential communication' is defined in terms of intent. Intent may be inferred from the circumstances, *e.g.,* the taking or failing to take of precautions. A communication made in public or meant to be relayed to outsiders can scarcely be considered confidential. Unless intent to disclose is apparent, a communication between husband and wife is confidential."

The Commentary thus instructs that communications between spouses are presumed confidential unless the circumstances indicate that "intent to disclose is apparent." *See* John W. Strong, *McCormick on Evidence* § 80, 330 (5th ed 1999) (stating that "[c]ommunications in private between husband and wife are assumed to be confidential" and noting circumstances that may strengthen or rebut a claim of confidentiality).

■ In our view, the Commentary clarifies that the legislature intended the communicating spouse's intent to govern confidentiality. That is so because, in most situations, the

communicating spouse is the person making the communication and—at least, initially—is the spouse in a position to assess the nature of the communication and to control the circumstances under which the communication is made. For example, the communicating spouse controls the subject, content, wording, language, and medium in which the communication is made, whether the communication is made in the presence of others, and the volume and intonation of his or her voice. And, it is the communicating spouse who is in a position to advise the noncommunicating spouse not to disclose the communication to others. Furthermore, such an approach balances the underlying purpose of the evidentiary privileges, which is to foster open communication, with the truth-seeking function embodied in the evidentiary rules.[6] We thus conclude that the legislature intended that the communicating spouse's intent governs the confidentiality of communications between spouses because the communicating spouse has primary control over the circumstances in which the communication itself is made.

■■■ Generally, the burden is on the party asserting the privilege to establish that he or she is entitled to assert it and that the communications that he or she seeks to exclude fall within the scope of the privilege. *See Groff v. S. I. A. C.*, 246 Or 557, 565, 426 P2d 738 (1967) (regarding assertion of privilege as to disclosure and use of public assistance records under ORS 411.320). However, the Commentary indicates that the legislature intended that communications made during marriage be presumed confidential, unless intent to disclose is apparent from the circumstances.[7] In light of that

---

[6] We note that, in general, the evidentiary privileges—including the marital privileges—are distinguishable from most other evidentiary rules in that they are designed to limit the search for the truth, rather than facilitate its discovery. Strong, *McCormick on Evidence* § 72 at 298-99. The resulting loss of relevant evidence is tolerated to protect certain relationships that have been deemed sufficiently important, such as the relationship between married persons, doctor and patient, clergy and penitent, and attorney and client. *Id.* at 299. Generally speaking, the purpose of the evidentiary privileges is to encourage open communication between the persons in the protected relationship, which theoretically, in turn, strengthens that relationship and encourages participation in such relationships. *Id.* at 299-300.

[7] Other authorities support the same presumption. *See, e.g., Blau v. United States*, 340 US 332, 333, 71 S Ct 301, 95 L Ed 2d 306 (1951) ("[M]arital communications are presumptively confidential."); Edward J. Imwinkelried, *The New Wigmore: Privileges* § 6.8, 671-72 (2002) (citing authorities recognizing

presumption, we conclude that defendant need only demonstrate that he was married to wife and that a communication with wife had occurred during the marriage. The burden of persuasion then shifts to the proponent of the evidence—the state, in this case—to rebut the claim of privilege by demonstrating that the communicating spouse did not intend the communication to be confidential. *See State v. Clay*, 332 Or 327, 332, 29 P3d 1011 (2001) (describing effect of presumption).

Having concluded that the communicating spouse's intent governs confidentiality and that a presumption of confidentiality exists, we next consider the contested communications. The communications at issue here may be divided into two groups for purposes of our analysis: those that occurred before the murders, and those that occurred after the murders. Communications that occurred before the murders include wife's notes to defendant and the telephone conversations between defendant and wife regarding her desire for a divorce, her affair, and her pregnancy as a result of the affair. The latter group of communications includes defendant's statements to wife about heading into work, his truck breaking down, losing his cell phone, and purchasing a laptop computer. We address each group of communications separately.

2. *Communications That Occurred Before the Murders*

We review evidentiary rulings for errors of law. *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000). However, we are bound by a trial court's factual findings, if the record contains evidence to support them. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). If the trial court failed to articulate a factual finding on a pertinent issue, we assume that the trial court decided the facts "in a manner consistent with the court's ultimate conclusions, as long as there is evidence in the record, and inferences that reasonably may be drawn from that evidence," that would support its conclusion. *State v. Juarez-Godinez*, 326 Or 1, 7, 942 P2d 772 (1997).

presumption of confidentiality for spousal communications); 8 Wigmore, *Evidence* § 2336, 652 (1961) ("[A]ll marital communications should be presumed to be confidential until the contrary appears.").

■ We begin with wife's notes to defendant. The trial court concluded that wife's notes were privileged because, although the trial court found that wife had discussed with others the subject matter of the notes, there was "no evidence that either party discussed these communications, as opposed to the subject matter of the communications, with outsiders."

The state asserts that the notes were not privileged because wife did not, at the time that she wrote them, intend either the fact of the communications or the subject matter of the communications to be confidential. The state argues that evidence that wife told others about the subject matter of the notes supports the conclusion that wife did not intend her communications with defendant to be confidential. It also argues that evidence that wife had discussed with others how she should tell defendant about her desire for a divorce and her affair demonstrates that she also did not intend the fact of the communications themselves to be confidential.

As discussed, we presume that wife intended her communications to defendant to be confidential. The record, rather than rebutting that presumption, reinforces it. In particular, wife testified at the suppression hearing that she intended both notes to be for defendant alone and that she did not consult anyone in writing them. Furthermore, wife's decision to leave notes for defendant in the family home, where the most likely outcome would be that only defendant would see them, permitted the trial court to infer an intention of confidentiality. And, although not dispositive in itself, the subject matter of the notes was of an intimate nature. Finally, the state offered no evidence to support a contrary inference sufficient to overcome the presumption of confidentiality that the rule creates.

As the state points out, wife told others about her plans to leave defendant. By the time that wife left defendant the first note, wife had told several people—including her mother, sisters, friends, and coworkers—that she intended to leave defendant. And, by the time that wife left defendant the second note, she had told her sisters and her mother that she had had an affair. Wife also testified that she had discussed

with others how she should tell defendant about her desire for a divorce and her affair.

▄▄ In determining confidentiality, a court looks to the communicating spouse's intent at the time that the communication was made. *See* OEC 505(1)(a) Commentary (1981) (stating that intent may be inferred from the circumstances); Inwinkelried, *The New Wigmore: Privileges* § 6.8 at 671 (stating that confidentiality inquiry focuses on the time of the communication). The record supports the trial court's finding that there was no evidence that wife had discussed with others the existence of the notes themselves once she had left them. Accordingly, the trial court did not err when it concluded that wife's notes to defendant were confidential communications protected by the marital communication privilege set out in OEC 505(2).

▄▄ We next consider whether defendant or wife waived the privilege as to wife's notes. The state asserts that only wife's waiver of the privilege was required because wife was the privilege-holder as to her communications to defendant. That argument contradicts the plain text of OEC 505(2), which expressly states that "[t]he privilege created by this subsection may be claimed by either spouse." Thus, the text of OEC 505(2) compels a conclusion that the legislature intended to permit either spouse to assert the marital communications privilege as to "any confidential communication made by one spouse to the other during the marriage." And, as we already have discussed, the legislature's use of the word "any" to modify the phrase "confidential communication" demonstrates that—excluding the express exceptions listed in OEC 505(4)—the legislature intended to include within the protection of OEC 505(2) *all* confidential communications between spouses. Under those provisions, both spouses hold the privilege, and, therefore, both spouses must waive the privilege for an otherwise privileged confidential communications to be admissible.

As noted, a privilege-holder may waive his or her privilege if he or she "voluntarily discloses or consents to disclosure of any significant part of the matter or communication." OEC 511. In *Oregon Evidence*, Kirkpatrick explains:

"Only the communication is privileged, not the holder's knowledge of the facts. Therefore, the holder may disclose the facts to third persons without waiving the privilege. For example, a client may speak freely to nonprivileged persons about the facts of an automobile accident without waiving the right to prevent the attorney from being questioned regarding specific communications from client about that accident."

*Id.* § 511.03[1] at 402-03.

However, even if one spouse has waived his or her privilege of confidentiality, that choice cannot bind the other spouse. Thus, the question whether wife waived her privilege as to the notes when she discussed her desire for a divorce, her affair, and her pregnancy with friends and family members is largely irrelevant, because wife unquestionably waived her privilege when she agreed to testify on the state's behalf. As for defendant, however, we cannot conclude that the trial court's findings are without basis in the record and that defendant waived the privilege as to wife's notes. Although defendant later spoke to Preciado about facts that were included in the notes—for example, that wife wanted a divorce—the record does not support an inference that defendant told Preciado that wife had told him about those things in two notes that she had left for him in the family home. Because defendant merely disclosed the subject matter of the notes, the record permitted the trial court to conclude that the notes were privileged.

We next address the state's argument that wife did not intend her side of the telephone conversations regarding the notes that she left for defendant to be confidential. The trial court determined that wife's side of the telephone conversations, which wife's sister had overheard, were not privileged. On appeal, both parties discuss wife's intentions regarding her side of those telephone conversations. In sum, the state argues that wife's side of the telephone conversations regarding the notes was admissible because wife had discussed with others the subject matter of the notes. Defendant disagrees. However, because the trial court ruled in the state's favor on that issue, and defendant did not cross-appeal or otherwise challenge that ruling, we do not address

it. We therefore proceed to consider the communications that occurred after the murders.[8]

### 3. *Communications That Occurred After the Murders*

The state also argues that defendant's statements to wife after the murders—about going into work, his truck breaking down, losing his cell phone, and purchasing a laptop computer—were not protected by the marital communications privilege because the circumstances at the time that defendant made them do not demonstrate that he intended them to be confidential. The state further argues that those statements, by their nature, were not confidential because they were "routine communications," related to the "business of marriage." The trial court excluded those statements, because it found that it was not apparent from the circumstances that defendant had intended them to be disclosed to others. The trial court noted that defendant's intent was "a close question," explaining that,

> "[i]n most innocent circumstances, one would not infer an intent to maintain confidentiality * * * from one spouse to another regarding mechanical trouble or a lost cell phone. However, these are not innocent circumstances. The state's theory is that Mr. Serrano lied to his wife to cover up his criminal tracks. One reasonable inference would be that he intended that she repeat the statements to others to mislead others as well. However, it is more reasonable to infer that these communications were directed at misleading his wife at the time and were not intended to incur the additional scrutiny that would result from their being repeated to and questioned by others."

We again begin with the presumption that communications between spouses are confidential, unless the proponent of the evidence at issue establishes that the communicating spouse's intent to disclose is apparent from the circumstances. Although the record does not reflect that defendant expressly asked wife to keep his statements confidential, it nevertheless shows that defendant made those

---

[8] The trial court excluded defendant's side of the telephone conversations regarding wife's notes, and neither party addresses that ruling on appeal. For that reason, we also need not address any issues regarding defendant's side of those conversations.

statements directly to wife and outside the presence of others. As the trial court found, these circumstances permit an inference that defendant did not intend his statements to be disclosed to others. Accordingly, the trial court did not err when it concluded that the state had not overcome the presumption of confidentiality.

We also reject the state's argument that defendant's statements were not confidential communications because they pertained to "routine matters." Nothing in OEC 505(2) suggests that conversations regarding "routine matters" automatically should be excluded from the scope of the marital communications privilege. Rather, as we already have discussed, the privilege extends to "any confidential communication" between spouses. OEC 505(2). Further, as we already have noted, the subject matter of the communication is but one aspect of the circumstances to be considered in determining the communicating party's intent. The record permits the trial court's conclusion that, when defendant made the statements to wife, he did not intend them to be disclosed to others.

 We next consider whether defendant later waived the privilege as to his communications to wife after the murders. The trial court did not specifically address that issue in its letter opinion. Rather, it stated that, except for wife's side of the telephone conversations that had occurred before the murders and several other communications that are not at issue on appeal, "[a]ll the other communications are privileged and [defendant] has not waived the privilege." The state, for its part, contends that defendant waived the privilege as to at least two of the communications that he had with wife after the murders by discussing the subject matter of those communications with Detective Hays.

Although the trial court's letter opinion contains no findings about whether defendant waived the privilege as to the communications in question that occurred after the murders, we assume that the trial court decided the facts consistently with its ultimate conclusion, as long as the record contains evidence to support it. *Juarez-Godinez*, 326 Or at 7. During defendant's interview with Detective Hays on November 28, 2006, defendant told Detective Hays that he

had parked his truck a few blocks from his house because it had broken down. He also told Detective Hays during that interview that he had lost his cell phone while shopping at WinCo. Although defendant clearly disclosed to Detective Hays the subject matter of some of his earlier communications with wife, there is no evidence in the record that defendant later disclosed to Detective Hays that he had told wife about his truck breaking down and losing his cell phone. Thus, defendant did not disclose to Detective Hays or anyone else *any* part—much less "a significant part"—of his communications to wife. That evidence supports the trial court's ultimate conclusion under OEC 505 that defendant did not waive the marital communications privilege as to the communications that he made to wife after the murders.

## III. CONCLUSION

In summary, wife's notes to defendant qualified as confidential communications within the meaning of OEC 505(1)(a). Because the state presented no evidence to demonstrate that defendant had waived the privilege as to those communications, the notes are privileged under OEC 505(2). Similarly, defendant's statements to wife about going into work, his truck breaking down, losing his cell phone, and purchasing a laptop computer also qualified as confidential communications under OEC 505(1)(a). Because the state presented no evidence to show that defendant had waived the privilege as to those communications, they too are privileged under OEC 505(2).

The order of the circuit court is affirmed.