No. w38          December 21, 2023          739

IN THE SUPREME COURT OF THE
STATE OF OREGON

Inez GOLLERSRUD,
an individual, and
David Gollersrud, an individual,
*Plaintiffs-Relators,*

*v.*

LPMC, LLC,
dba Landmark Professional Mortgage,
an Oregon limited liability company,
*Defendant-Adverse Party,*

*and*

Tyler WESTBY,
an individual et al.,
*Defendants.*
(CC 16CV36031) (SC S069796)

Original proceeding in mandamus.*

Argued and submitted May 16, 2023.

C. Robert Steringer, Harrang Long P.C., Portland, argued the cause for plaintiffs-relators. Julian Marrs filed the briefs. Also on the briefs were C. Robert Steringer and Adina Matasaru.

William Gaar, Buckley Law P.C., Lake Oswego, argued the cause and filed the brief for defendant-adverse party. Also on the brief was Jillian Pollock.

Lisa T. Hunt, Law Office of Lisa T. Hunt, LLC, Lake Oswego, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

_____
* On petition for alternative writ of mandamus from an order of Marion County Circuit Court, Audrey J. Broyles, Judge.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, Bushong, James, and Masih, Justices.**

JAMES, J.

A peremptory writ of mandamus shall issue.

_____

** Baldwin, Senior Judge, Justice pro tempore, participated in oral argument, but did not participate in the consideration or decision of this case.

**JAMES, J.**

This mandamus proceeding requires us to decide two issues: (1) whether email messages between a client and their attorney, sent from, and stored on, the client's employer's email system are "confidential communications" as defined in OEC 503(1)(b); and (2) if they are, whether an employee's act of leaving employment and, in turn, leaving those email messages on the employer's email system constitutes a disclosure of communications and a waiver of the attorney-client privilege under OEC 511. As to the first issue regarding confidentiality under OEC 503(1)(b), based on the text, context, and legislative history, we conclude that communications between a client and an attorney, made for the purpose of facilitating the rendition of professional legal services to the client, are presumptively confidential. The client's mere use of an employer's email system, without more, does not overcome that presumption of confidentiality. As to the second issue concerning waiver of privilege under OEC 511, we hold that, at least on this record, leaving the emails on the employers' systems did not establish actual disclosure of communications—a necessary predicate to an OEC 511 waiver analysis. Although we do not foreclose the possibility that a party could make an evidentiary record demonstrating a lack of privilege under OEC 503(1)(b), or that such privilege had been waived through actual disclosure under OEC 511, for email communications sent from and stored on an employer's server, the record here is insufficient. Accordingly, a peremptory writ shall issue.

## I.  BACKGROUND

We take the facts from the record in the underlying trial court proceedings. *Barrett v. Union Pacific Railroad Co.*, 361 Or 115, 117 n 1, 390 P3d 1031 (2017). Relators David Gollersrud and his mother, Inez Gollersrud, alleged fraud, among other claims, in a real estate investment relationship between plaintiffs and several defendants, including LPMC, LLC (LPMC). Because one of the other defendants was involved in an ongoing bankruptcy proceeding, the parties agreed to informally abate the case pending the outcome of that proceeding. During that abatement period, they agreed to mediate and conduct informal, limited discovery.

LPMC issued subpoenas to three of Mr. Gollersrud's former employers. In those subpoenas, LPMC sought to compel production of all communications, from 2008 to the present, between Mr. Gollersrud's work email addresses and nine other email addresses, among them that of Ms. Gollersrud. Relators sought to quash LPMC's subpoenas on the ground that some of the email messages between Mr. Gollersrud and Ms. Gollersrud included communications with their attorneys and were therefore protected under the attorney-client privilege, codified at OEC 503.[1] They alternatively proposed that the scope of the subpoenas be limited or that the trial court order that their attorneys be permitted to screen privileged documents produced in response to the subpoenas.

In response, LPMC argued that the email messages were not covered by the attorney-client privilege because (1) Mr. Gollersrud had no reasonable expectation of privacy in email communications transmitted using his employers' email systems; and (2) even if the email messages were privileged when transmitted, that privilege had been waived when Mr. Gollersrud failed to delete them from his employers' email systems before severing his employment relationships.

After taking the matter under advisement, the trial court denied relators' motion to quash the subpoenas. In a letter opinion, the trial court concluded that the email messages "between Mr. Gollersrud and [Ms.] Gollersrud to be recovered from the former employers' servers are not privileged." The trial court concluded by requesting that LPMC prepare a proposed order.

Relators objected to LPMC's proposed order and requested that the trial court hold an evidentiary hearing on the attorney-client privilege issue or, in the alternative, clarify its findings. In support of that objection, Mr. Gollersrud submitted a supplemental declaration that stated that (1) it was his "understanding that none of [his] three prior employers monitored the use of [his] computer or e-mail while [he] was employed with them"; (2) he had "received no notices

---

[1] Although relators initially opposed LPMC's subpoenas on several additional grounds, they did not raise those issues in their mandamus petition, and we do not consider them here.

from any of [his] three prior employers that they were monitoring [his] email use while [he] was employed with them"; (3) "[n]o third parties had a right of access to the computers or e-mail accounts [he] used while [he] was employed with [his] three prior employers"; and (4) his "computers and email accounts with [his] three prior employers were protected by passwords known only to [him]." Mr. Gollersrud's supplemental declaration is the only evidence in the record regarding his former employers' email policies.

Shortly after the objection was filed, the trial court action was stayed due to the bankruptcy of another defendant. When the litigation resumed, the trial court issued a letter opinion advising that it would sign LPMC's proposed order and denying relators' request for clarification of its prior ruling. It is not clear from the record whether the trial court considered the material in Mr. Gollersrud's supplemental declaration.

Relators then petitioned this court for a writ of mandamus. This court issued an alternative writ of mandamus directing the trial court to either vacate its order or show cause why it should not do so. The trial court declined to vacate its order. As a result, the parties proceeded to argument in this court.

## II. ANALYSIS

### A.  *Jurisdiction*

Because this case comes to us on mandamus, we first consider whether this court has jurisdiction to issue the writ. The statutory requirements for mandamus jurisdiction are set out in ORS 34.110. First, the writ may be issued only to enforce "a known, clear legal right." *State v. Moore*, 361 Or 205, 212, 390 P3d 1010 (2017). Second, the writ may be issued only if there is no "plain, speedy and adequate remedy in the ordinary course of the law." ORS 34.110. In most cases, direct appeal is a plain, speedy, and adequate remedy. *See State ex rel Automotive Emporium v. Murchison*, 289 Or 265, 268-69, 611 P2d 1169, *reh'g den*, 289 Or 673, 616 P2d 496 (1980). However, when a discovery order erroneously requires disclosure of privileged communications, we have held that direct appeal is inadequate,

because, once a privileged communication has been disclosed, the harm cannot be undone. *Crimson Trace Corp. v. Davis Wright Tremaine LLP*, 355 Or 476, 485, 326 P3d 1181 (2014); *State ex rel OHSU v. Haas*, 325 Or 492, 497, 942 P2d 261 (1997).

We conclude that the issues presented by this case fall squarely within our mandamus jurisdiction. A peremptory writ of mandamus, if issued, would be used to enforce a legal right: namely, relators' right not to produce privileged communications. If the trial court's ruling requiring the disclosure of Mr. Gollersrud's email messages was erroneous because it did not correctly interpret OEC 503 and OEC 511, then an appeal would not be adequate to remedy the harm caused by the disclosure of those protected communications. Mandamus being an appropriate vehicle to address the issue here, we turn to the merits.

B.   *Overview*

The attorney-client privilege is one of the oldest and most broadly recognized evidentiary privileges. The privilege, codified at OEC 503,[2] seeks to "'encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Haas*, 325 Or at 500 (quoting *Upjohn Co. v. United States*, 449 US 383, 389, 101 S Ct 677, 66 L Ed 2d 584 (1981)). Although the attorney-client privilege is expansive, it is not absolute; OEC 503 establishes threshold requirements for the privilege, and OEC 511 allows for waiver of any evidentiary privilege, including the attorney-client privilege. *Longo v. Premo*, 355 Or 525, 533, 326 P3d 1152 (2014).

OEC 503(2) provides, in part:

> "A client has a privilege to refuse to disclose and to prevent any other person from disclosing *confidential communications* made for the purpose of facilitating the rendition of professional legal services to the client[.]"

---

[2] The legislature amended OEC 503 in 2023. Or Laws 2023, ch 72, § 33. Because those amendments are not effective until January 1, 2024, and, in all events, are not material to our analysis, we cite the current version of the statute.

(Emphasis added.) That general rule is subject to numerous caveats, but, overall, assertions of the attorney-client privilege in Oregon require (1) a communication between classes of persons described in OEC 503(2)(a) to (e); (2) that the communication be made for the purpose of facilitating the rendition of professional legal services to the client; and (3) that the communication be "confidential" within the meaning of OEC 503(1)(b), which defines a "confidential communication" to mean

> "a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."

The parties agree that resolution of this case hinges on the meaning of confidentiality, and in particular, the interpretation of "not intended to be disclosed" as used in OEC 503(1)(b).

As such, the questions presented in this case are ones of statutory interpretation. The rules of evidence are adopted by the legislature and our construction of them follows our traditional method of statutory interpretation focusing on text, context, and legislative history. *Crimson Trace Corp.*, 355 Or at 485; *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). "The principal source of legislative history for the 1981 Oregon Evidence Code is the 1981 Conference Committee Commentary." *State v. Serrano*, 346 Or 311, 324, 210 P3d 892 (2009).

## C.  *The Burden of Proof to Establish a Confidential Communication*

We begin with the predicate issue of which party bears the burden of proving that communications are—or are not—confidential. Generally, the burden is on the party asserting a privilege to establish that it applies. *See Groff v. S.I.A.C.*, 246 Or 557, 565, 426 P2d 738 (1967) (regarding assertion of privilege as to disclosure and use of public assistance records under ORS 411.320). Here, relators asserted the attorney-client privilege in their motion to quash, but the support for that assertion initially consisted solely of Mr. Gollersrud's declaration, which stated, in relevant part:

"I cannot recall all of the email communications I have sent to, received from or which include my mother over the course of almost ten years. However, I expect many of these communications would involve:

"* * * * *

"Communications including privileged communications with attorneys in this case, related cases, and other unrelated family and business legal matters."

After the court ruled, relators objected to its ruling and submitted Mr. Gollersrud's second declaration, which addressed his lack of knowledge of workplace email monitoring policies. No party here disputes that relators' initial motion to quash was sufficient to meet the first and second prongs of invoking the attorney-client privilege—*i.e.*, the existence of communications between a class of persons found in OEC 503(2)(a) to (e), and that the communications were made for the purpose of facilitating the rendition of professional legal services. The sole issue is whether the communications were confidential, and who bore the burden on that question.

The core of OEC 503(1)(b)'s definition of a confidential communication is a "communication not intended to be disclosed to third persons." It is a phrase framed in the negative. We have interpreted similar wording, in the context of other privileges, to create a presumption of confidentiality. In *Serrano*, this court determined that there can be a presumption of confidentiality when considering marital communications, and that that presumption can only be defeated if the "proponent of the evidence at issue establishes that * * * intent to disclose is apparent from the circumstances." 346 Or at 330. To reach that conclusion, the *Serrano* court determined that, based on OEC 505(1)(a) Commentary (1981), the legislature intended for communications made during marriage to be presumed confidential under OEC 505. *Id.* at 324-26. The court further explained that, if the other requirements for the privilege are met, the burden of persuasion shifts to the proffering party to rebut the presumption of privilege "by demonstrating that the communicating spouse did not intend the communication to be confidential." *Id.* at 326.

We see no reason why the same presumption should not apply to OEC 503.[3] Both evidentiary privileges use the phrase "not intended to be disclosed to" others in their definitions for "confidential communication." OEC 503(1)(b); OEC 505(1)(a). In addition, the commentaries to both OEC 505 and OEC 503 contain nearly identical provisions explaining that the presence of intent to disclose must be apparent for the communications to not be confidential. OEC 503(1)(b) Commentary (1981) ("Unless an intent to disclose is apparent, however, the attorney-client communication is confidential."); OEC 505(1)(a) Commentary (1981) ("Unless intent to disclose is apparent, a communication between [spouses] is confidential."). Further, both privileges share the underlying goal of encouraging open communication between the persons in the protected relationships. *See Serrano*, 346 Or at 325 n 6 (so stating). Although this court has not formally adopted a presumption of confidentiality in attorney-client privilege cases, it has previously found communications to be confidential when the parties merely state that they intended their communications to be confidential. *See Crimson Trace Corp.*, 355 Or at 490-91 (determining that the relevant communications were confidential because the parties intended for them to be confidential).

We thus conclude that, in asserting the attorney-client privilege, the burden is on the individual asserting the privilege to establish (1) communications between a class of persons found in OEC 503(2)(a) to (e), that (2) were made for the purpose of facilitating the rendition of professional legal services. When that is established, such communications are presumptively confidential. At that point, the burden shifts to the proponent of the evidence to overcome the presumption of confidentiality. In this case, as discussed, no party is disputing that Mr. Gollersrud's first declaration

---

[3] Although the *Serrano* court stated that reference to other evidentiary rules was "of limited value" in that case, 346 Or at 323, we do not find the same problem here. In *Serrano*, one of the issues concerned a unique feature of the marital communications privilege: unlike many of the other privileges that are held by one person (attorney-client, psychotherapist-patient, physician-patient, and clergy-penitent privileges), the spousal communication privilege is held by both spouses. *Id.* at 323-24. The *Serrano* court found the case law on the other privileges unhelpful because it was tasked with deciding whether the "intent to disclose" inquiry focused on the communicating or the noncommunicating spouse. *Id.* at 323-25.

was sufficient to establish points one and two. As such, that declaration was sufficient to entitle the Gollersruds to a presumption of confidentiality in any lawyer-client communications sent from, or stored upon, Mr. Gollersrud's former employers' servers. The burden to overcome that presumption thus shifted to LPMC.

D.   *Did LPMC defeat the presumption of confidentiality?*

It is undisputed that the communications between Mr. Gollersrud and his attorney were sent on Mr. Gollersrud's employers' email systems. LPMC argues:

> "When an employee chooses to use a third-party employer owned work computer and email systems to transmit and receive personal emails with the employee's personal attorney, the attorney-client privilege does not attach to the email communications. There is no legal prohibition that bars a private employer from searching, inspecting, or viewing emails transmitted or stored on the private employer's email system. There is accordingly a risk that the employer will access an employee's personal emails that were transmitted through and saved to the employer's email system. By choosing to use the employer's email system to send, receive, or save personal emails, the employee assumes the risk of disclosure of the personal emails to the employer."

In effect, LPMC argues that any time an email is sent from a system where third parties could potentially discover the contents, that establishes, *per se*, that such communications are not confidential. We decline to adopt LPMC's *per se* approach for a number of reasons.

First, the commentary to OEC 503(1)(b) provides that, "[u]nless an intent to disclose is apparent, \*\*\* the attorney-client communication is confidential." OEC 503(1)(b) Commentary (1981). The commentary further notes that intent is to be "inferred from the circumstances, *e.g.*, taking or failing to take precautions." *Id*. The rule contemplates a circumstance-specific inquiry, not a one-size-fits-all approach.

Additionally, we have held that confidentiality is not defeated merely from the mere awareness of a risk of disclosure. For example, in *Chaimov v. Dept. of Admin. Services*, 370 Or 382, 401, 520 P3d 406 (2022), we rejected

the plaintiff's argument that "the completed request forms at issue *** were not confidential at any point in time, because [the department] had warned state agencies that the forms could be subject to disclosure at some point in the future." In doing so, we explained that "[c]onfidentiality as defined in OEC 503(1)(b) focuses on the client's intent" and that there was "no evidence that the state agencies or [the department] *intended* to disclose the forms at any time. The state agencies were only warned that the forms *might* be disclosed in the future, which is not the same." *Id.* at 401-02 (emphases in original).

Requiring something more than just the *possibility* that a communication might be disclosed to overcome the presumption of confidentiality is in keeping with the animating purpose of the privilege. The legislature enacted the current version of the attorney-client privilege in 1981. *See* Or Laws 1981, ch 892, § 32. OEC 503 is based on the federal analog, proposed Rule 503 of the Federal Rules of Evidence. *Longo*, 355 Or at 534; *see also* OEC 503 Commentary (1981) (OEC 503 "is based on proposed Rule 503 of the Federal Rules of Evidence, which was prescribed by the United States Supreme Court and submitted to Congress but not enacted."). Notably, a purpose of OEC 503 was to extend coverage "to areas in which current law [was] silent or unclear." OEC 503 Commentary (1981). As the commentary states, "[i]n the past, substantial authority has allowed an eavesdropper to testify to overheard privileged conversations and has admitted intercepted privileged letters. The evolution of ever more sophisticated techniques of recording and interception calls for the abandonment of that position." OEC 503(2) Commentary (1981). The legislature intended OEC 503 to be adaptive to changing times and changing modes of communication. OEC 503, is, accordingly, a rule grounded in practicalities and pragmatism. OEC 503 was intended to govern how people realistically communicate. *See, e.g.*, OEC 503(1)(b) Commentary (1981) ("The rule allows some disclosure beyond the immediate circle of lawyer and client and their representatives without impairing confidentiality, as a practical matter.").

LPMC's proposed *per se* rule conflicts with the pragmatism of OEC 503 in that it ignores the practical

realities of modern life, and it does not reflect how many Oregonians live and work. For many, a clear divide between work and nonwork does not exist. *See* Leora Eisenstadt, *Data Analytics and the Erosion of the Work/Nonwork Divide*, 56 Am Bus LJ 445, 449 (2019). The United States Bureau of Labor Statistics shows that roughly a third of the workforce—34 percent in 2022, worked remotely at least part of the week. U.S. Bureau of Labor Statistics, *American Time Use Survey—2022 Results* (2023), *available at* https://www.bls.gov/news.release/pdf/atus.pdf (accessed Dec 14, 2023). The common practice of telework has brought employer computer systems and employer paid network access into the home, with an accompanying blurring of the lines between private and work communication, and the network infrastructure supporting each. *See* Lawrence E. Rothstein, *Privacy or Dignity?: Electronic Monitoring in the Workplace*, 19 NY L Sch J Int'l & Compar L 379, 382 (2000). In short, for many Oregonians, personal and work business is increasingly conducted from devices and accounts that are not clearly delineated.

LPMC argues that any practical concerns are easily solved by requiring a strict adherence to a divide between work and personal email:

> "The employee can eliminate such risk and preserve the attorney-client privilege by taking reasonable precautions to protect communication from disclosure, such as using the employee's personal email account on the employee's personal computer, laptop, or phone, or communicating with the employee's attorney by phone."

LPMC's argument, which, as noted, is grounded in a risk of possible disclosure, presupposes that personal email contains no such risk. That assumption does not bear weight. "Though an employer may have a comparatively broad right to monitor the email messages flowing through its systems, they are not the only party with a qualified right to do so." Anthony Biondo, *Confidentiality and Attorney Client Privilege in the Internet Age: How to Handle Employer Monitoring of Employee Email*, 90 St John's L Rev 441, 443 (2016). Most personal email is hosted by "free" email service providers (Gmail, Yahoo! Mail, AOL Mail, etc.) who

themselves reserve the right to monitor the contents. As an example, Google's current terms of service provide that when a user sends or receives "content," including emails, they provide Google with a "worldwide," "non-exclusive," and "royalty-free" license to "host, reproduce, distribute, communicate, and use"; "publish, publicly perform, or publicly display"; or "modify and create derivative works based on" that content. Google Terms of Service, http://policies.google.com/terms?hl=en-US (accessed Dec 14, 2023). That reality of email communications, including personal hosted email, is another reason that a mere risk of disclosure cannot suffice, on its own, to overcome the presumption of confidentiality.

In contrast to LPMC's *per se* approach, relators and *amicus* urge us to look to the framework adopted by the United States Bankruptcy Court for the Southern District of New York in *In re Asia Global Crossing Ltd.*, 322 BR 247 (Bankr SDNY 2005). There, the bankruptcy court held that, to determine an employee's privacy expectations regarding computer files and email on an employer's servers, a court should consider four factors:

> "(1) does the [employer] maintain a policy banning personal or other objectionable use, (2) does the [employer] monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, or the use and monitoring policies?"

322 BR at 257.

In *Asia Global*, the court highlighted the similarities between the attorney-client privilege and the right to privacy, and it derived those factors from its right to privacy cases. *Id.* at 256-58. In that case, a bankruptcy trustee moved to compel production of email messages between employees and their outside counsel that were exchanged via the employer's email system. *Id.* at 252-54. The trustee had argued that, because the employees communicated with outside counsel using the employer's email system, the email messages were not protected by attorney-client privilege. *Id.* The court indicated that it presumed the email messages in question to be privileged and that the employees "subjectively intended that they be confidential." *Id.* at

258-59. Ultimately, after considering the four factors, the court concluded that the email messages were indeed privileged, despite both the employer's ability to access the email messages and the presence of an employer policy against personal email use, because the employer's policy against such use was not communicated clearly to the employees. *Id.* at 259-61.[4]

We also observe that the cases that LPMC cites in support of its argument that this court should adopted a *per se* rule do not, themselves, announce a *per se* rule; they rather rely on the existence of company policies that would make an employee's belief that the email messages were confidential unreasonable. *See, e.g.*, *In re Reserve Fund Sec. and Derivative Litig.*, 275 FRD 154, 158-59 (SDNY 2011) (concluding that email messages sent to and from the husband's work email address were not protected by the marital communications privilege where employees were regularly reminded that the email account was for business purposes only and email messages contained there were subject to disclosure); *Aventa Learning, Inc. v. K12, Inc.*, 830 F Supp 2d 1083, 1108 (WD Wash 2011) (finding that the attorney-client privilege did not attach to employee's email messages and communications created and sent or received on the employer's email systems and stored on the employer's servers, where employee had been informed that employer reserved right to access and disclose any file or communication stored on the employee's computer at any time).

We agree with relators and *amicus* that overcoming the presumption of confidentiality must come from a particular evidentiary showing. However, the *Asia Global* factors may not be fully encompassing of all the circumstances that a court properly might consider. Accordingly, we state the rule in more general terms: The burden to overcome the presumption of confidentiality falls to the proponent of the evidence allegedly barred by privilege. Overcoming the

---

[4] *Asia Global*'s approach is similar to that employed in some other jurisdictions. For example, a California appellate court determined that the plaintiff-employee's email messages to her attorney using her business email account were not privileged in light of the employer's policy against personal use of the business email account and the employee's awareness of that policy. *Holmes v. Petrovich Development Co.*, 191 Cal App 4th 1047, 1071, 119 Cal Rptr 3d 878 (2011).

presumption requires an evidentiary showing, one focused on the circumstances and context of the communications, that must establish more than a risk that privileged communications "*might* be disclosed." *Chaimov*, 370 Or at 402 (emphasis in original).

Applying the above considerations to the facts before us, we conclude that LPMC failed to make an adequate evidentiary showing to overcome the presumption of confidentiality. The record here is essentially blank. LPMC submitted no evidence that Mr. Gollersrud was aware of any employer policies concerning personal use of company equipment or the monitoring of employee email. LPMC submitted no evidence that Mr. Gollersrud's prior employers had ever acted on any email monitoring policies, either in their treatment of him, or other employees. Indeed, LPMC submitted no evidence that Mr. Gollersrud's former employers even had such policies at all. Finally, LPMC submitted no evidence that, whether in accordance with a policy or not, email was, in fact, monitored by the companies. Whether such evidence would have been sufficient to overcome the presumption of privilege—a point we do not decide—the record here lacked even that showing and was insufficient to overcome a claim of OEC 503 privilege.

E.    *Waiver of Privilege Under OEC 511*

We now briefly address waiver of the attorney-client privilege under OEC 511. LPMC asserts that, even if Mr. Gollersrud's email messages were confidential communications that the attorney-client privilege protects, he waived any privilege when he failed to delete those email messages from his previous employers' servers upon severing his employment.

OEC 511 provides, in part:

   "A person upon whom [OEC 503 to 514] confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person *** voluntarily discloses or consents to disclosure of any significant part of the matter or communication."

Unlike confidential communication under OEC 503(1)(b), which focuses on whether a communication was

"not intended to be disclosed," OEC 511 waiver is centered around an actual disclosure, whether express or implied. *See* Edward J. Imwinkelried, 1 *The New Wigmore: Evidentiary Privileges* § 6.8, 894 (3d ed 2017) (explaining that waiver of the privilege, in contrast, occurs after initial intent attaches and the holder's subsequent conduct manifests an intent to surrender the communication's confidentiality via disclosure). Accordingly, whether a communication was disclosed is first addressed as a factual inquiry by the trial court. OEC 104(1) (preliminary questions concerning, among other things, the existence of a privilege, shall be determined by the trial court); *Goldsborough v. Eagle Crest Partners, Ltd*., 314 Or 336, 342, 838 P2d 1069 (1992) (whether waiver of the attorney-client privilege occurred is a preliminary question of fact for the trial court under OEC 104). When a court orders disclosure, we look at the record in the light most favorable to disclosure, considering whether there was any evidence to support the factual finding. *See State ex rel Ware v. Hieber*, 267 Or 124, 127, 515 P2d 721 (1973). Whether a disclosure constitutes a waiver under OEC 511 is a question of law, reviewed for errors of law. *Goldsborough*, 314 Or at 342.

In *Goldsborough*, we distinguished our previous decision in *Bryant v. Dukehart*, 106 Or 359, 210 P 454 (1923), by noting that, "[i]n *Bryant*, there was no showing that the party claiming the privilege had turned over the privileged material." *Goldsborough*, 314 Or at 342. And as we explained in *Haas*, it is the showing of an actual disclosure that is the predicate for further OEC 511 analysis:

> "[W]hen a holder of the lawyer-client privilege voluntarily has disclosed material covered by the privilege, two considerations arise in determining whether a waiver has occurred: (1) whether the disclosure was 'itself a privileged communication' and, if not, (2) whether the disclosure was of a 'significant part of the matter or communication.'"

325 Or at 498 (quoting OEC 511). Finally, in *Chaimov* we noted that "the person must disclose part of the communication itself in order to effect a waiver." 370 Or at 401.

We have already explained why email messages sent from an employer's email system do not, *per se*,

overcome the presumption of confidentiality. It follows that Mr. Gollersrud's departure from employment did not, *per se,* establish voluntary disclosure. Nothing in this record establishes even actual disclosure—there is no evidence that Mr. Gollerrud's former employers have ever read, reviewed, or learned the contents of the emails—let alone a voluntary disclosure on the part of Mr. Gollersrud. Without evidence of a voluntary disclosure, an OEC 511 analysis of waiver, on this record, is inapplicable.

In summary, we conclude that any email messages on Mr. Gollersrud's former employers' servers containing communications between relators and their attorneys are confidential communications as defined in OEC 503(1)(b) and are therefore protected under OEC 503, the attorney-client privilege. On this record, the confidentiality of those communications has not been overcome by a showing by LPMC. Similarly, this record is legally insufficient to establish an express or implied disclosure to a third party, as required under OEC 511.

A peremptory writ of mandamus shall issue.