Argued and submitted November 4, 2013, peremptory writ to issue
May 30, 2014

CRIMSON TRACE CORPORATION,
an Oregon corporation,
*Plaintiff-Adverse Party,*

*v.*

DAVIS WRIGHT TREMAINE LLP,
a Washington limited liability partnership;
Frederick Ross Boundy,
an individual;
and William Birdwell,
an individual,
*Defendants-Relators.*

(CC110810810; SC S061086)

232 P3d 980

Kevin Stuart Rosen, Gibson, Dunn & Crutcher, LLP, Los Angeles, argued the cause and filed the brief for defendants-relators. With him on the brief was Daniel L. Keppler.

Bonnie Richardson, Folawn Alterman & Richardson, LLP, Portland, argued the case and filed the brief for plaintiff-adverse party. With her on the brief was John Folawn.

Robyn Rider Aoyagi, Tonkon Torp LLP, Portland, filed a brief on behalf of *amici curiae* Interested Oregon Law Firms.

Bridget Donegan, Larkins Vacura LLP, Portland, and Kristian S. Roggendorf, of Roggendorf Law LLC, Lake Oswego, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Amar D. Sarwal and Evan P. Schultz, Association of Corporate Counsel, and Kelly Jaske, Jaske Law LLC, Portland, filed a brief on behalf of *amicus curiae* Association of Corporate Counsel.

LANDAU, J.

## LANDAU, J.

In this original proceeding in mandamus, relator Davis Wright Tremaine LLP ("DWT") challenges a trial court order compelling production of certain materials that, in DWT's view, are protected under the attorney-client privilege codified at OEC 503. The trial court issued the order in the context of a legal malpractice action against DWT by a former client. The materials that are the subject of the order are communications between DWT's designated in-house counsel and the lawyers in the firm who had represented the former client, and concern how actual and potential conflicts between the lawyers and the former client should be handled.

The trial court concluded that all but three of the communications with the firm's in-house counsel ordinarily would be covered by the attorney-client privilege under OEC 503. The court, however, recognized a "fiduciary exception" to the attorney-client privilege, which arose out of the fact that the firm was attempting to shield its internal communications from a former client.

We conclude that the trial court correctly determined that the attorney-client privilege as defined in OEC 503 applies to communications between lawyers in a firm and in-house counsel. We further conclude, however, that the trial court erred in recognizing an exception to OEC 503 that the legislature did not adopt in the terms of that rule. Accordingly, we issue a peremptory writ of mandamus ordering the trial court to vacate its order compelling production of materials related to those communications that it determined were otherwise subject to the attorney-client privilege.

## I.  BACKGROUND

Crimson Trace Corp. manufactures and sells laser grips for firearms. The company retained Birdwell, a lawyer with DWT, to prosecute certain patents for those products before the Patent and Trademark Office. Crimson later retained DWT to represent it in a dispute with a competitor, LaserMax, Inc., over possible patent infringements. Birdwell was joined by Boundy, who acted as lead trial counsel in the litigation in the federal district court.

The action did not go smoothly for Crimson. LaserMax asserted counterclaims that challenged the validity of the patents at issue. In particular, LaserMax argued that one of the patents—the "235 patent"—was invalid because Crimson had deceptively omitted material information when it submitted the patent to the Patent and Trademark Office. In its counterclaim, LaserMax named Birdwell as the lawyer who had prosecuted the patent.

Birdwell and Boundy became concerned that the "235 patent" counterclaim could create a conflict of interest between Crimson and the two DWT lawyers. Because LaserMax had named Birdwell as the attorney who had prosecuted that patent before the Patent and Trade Office, the firm could have been put in the position of defending Birdwell at the same time that it was defending Crimson. Birdwell and Boundy consulted with the firm's Quality Assurance Committee (QAC), a small group of DWT lawyers that had been designated by the firm as in-house counsel. Specifically, they consulted with Johnson, a member of the QAC, after which Boundy disclosed the potential conflict in an email to Crimson's CEO:

> "[Birdwell] is also alleged to be part of the deceptive activity. *** Under the circumstances, I should advise you that someone could argue I have a conflict of interest in that I may be defending my partner at the same time as I am representing Crimson ***. I frankly don't see this as an issue, but I do want you to know that you certainly have the right to consult with independent counsel to fully consider this."

Crimson offered to dismiss its claims relating to the "235 patent." LaserMax, however, refused to drop its counterclaims relating to that patent. Moreover, it sought to recover its attorney fees for defending against the claim. In asserting its claim for attorney fees, LaserMax argued that Crimson had both procured the "235 patent" and litigated the claim of infringement over it in bad faith. The district court granted LaserMax discovery for the purpose of determining whether Crimson in fact had acted in bad faith, and LaserMax subsequently subpoenaed Birdwell's files relating to the "235 patent." Birdwell and Boundy again consulted with the firm's QAC in determining how to respond.

Eventually, Crimson and LaserMax negotiated a settlement, which the parties agreed should remain confidential. When Boundy, acting for Crimson, moved to file the settlement under seal, however, he did so in a way that publicly disclosed certain details of the agreement and gave the impression that LaserMax had conceded liability, which it had not.

LaserMax complained about the disclosure. The district court concluded that Boundy's disclosures were intentional and damaging to LaserMax. As a result, the court disclosed the entire agreement and imposed a monetary sanction on Crimson for having acted in bad faith.

Meanwhile, Crimson had stopped paying DWT. Crimson's CEO told Boundy that the company had intentionally stopped paying because "we did not like the status of the case and what we were getting for our money." Boundy and Birdwell consulted extensively with Johnson and another member of the QAC, Waggoner, about how to proceed in the light of those revelations.

By that time, the litigation had begun to wind down: Crimson and LaserMax had entered into their confidential settlement agreement and the issue of Boundy's public and misleading references to the settlement terms was before the court. The two lawyers continued to communicate with the QAC about the sanction issue and the fee dispute as they went on with their representation of Crimson. Eventually, Crimson's CEO informed Boundy that Crimson's board of directors had become "hostile" to DWT, leading the lawyers and the firm to believe that Crimson was contemplating a malpractice action against them. The firm nevertheless continued to bill Crimson for small amounts of work performed in the LaserMax litigation until Crimson, in fact, did file an action for legal malpractice and breach of contract.

In its complaint, Crimson alleged that the defendants committed legal malpractice in various ways, including by (1) failing to advise Crimson about problems with its "235 patent" and that Birdwell would likely be a witness in any dispute about those problems; (2) failing to advise against suing LaserMax for infringing that patent; and (3) failing

to advise Crimson when conflicts arose in connection with LaserMax's request for attorney fees. Crimson also alleged that defendants had breached their legal services contract with Crimson by charging Crimson for work that was unnecessary, was of no value, and was performed in DWT's own interest at a time when DWT had a conflict of interest with Crimson.

In the course of the ensuing litigation, Crimson requested production of any communications between or among DWT's attorneys about possible conflicts of interest in DWT's representation of Crimson that occurred during the period when DWT still was representing Crimson. The discovery request specifically mentioned internal communications "regarding defendant Boundy's handling of the confidential settlement agreement with Laser[M]ax," "regarding the failure to disclose * * * to the Patent and Trademark Office during prosecution of the '235' patent," and "regarding professional duties owed by [DWT] to [Crimson], possible or actual breach of those duties, and/or prevention of loss related to duties owed to [Crimson]."

DWT resisted production, arguing that the communications Crimson sought were protected by the attorney-client privilege under OEC 503 because they involved the rendition of legal services by the firm's in-house counsel to the firm and its members. DWT also argued that some of the documents, which were prepared after DWT began to suspect that Crimson would sue them, were protected by the work-product doctrine.

Crimson responded by moving to compel DWT to respond to its discovery requests. DWT opposed the motion, again contending that the material requested was subject to the attorney-client privilege. In support, DWT offered, among other things, an affidavit of one of the members of the QAC, Thurber, which explained that "[m]embers of the [QAC] act as in-house counsel for the firm and its lawyers on matters relating to the work of the firm" and that, "[a]s a matter of firm policy and procedure, any documents generated from the work of the [QAC] do not become part of the client file for any firm client." The firm also introduced affidavits of Birdwell and Boundy, both of whom stated that their

communications with the firm's QAC "were intended to be confidential" and "were made for the purpose of facilitating the rendition of professional legal services" and "obtaining legal advice regarding the fulfillment of [their] professional responsibilities and other matters relating to the *LaserMax* case."

The trial court granted Crimson's motion in part, ordering DWT to supply its former client with a privilege log of every document responsive to Crimson's request for production and to produce the documents themselves to the court for *in camera* review. DWT complied with the order. After reviewing the documents that DWT had produced and considering additional arguments and other evidence in the matter, the trial court concluded that the first three of the documents in the privilege log were not privileged. The balance of documents, though, the court determined were subject to the attorney-client privilege. The court found:

> "The remaining documents on the privilege log, and by December 2010, at the interests of [DWT], they had a separate interest, and the lawyers who were representing Crimson * * * were intending to communicate to members of the [QAC] regarding [DWT's] separate interest. They were intending that those communications would be confidential attorney-client privileged communications."

The court nevertheless concluded that the privilege did not apply. The court explained that "what I'm left with is a series of communications by lawyers within the same firm that were intended to be confidential, and I think the—there is a conflict of interest that did arise under the circumstances of this case." Because of that conflict, the court concluded, the firm was not permitted to assert the attorney-client privilege. The court accordingly granted Crimson's motion to compel in its entirety, ordering DWT to produce to Crimson all of the documents identified in the privilege log.

DWT then filed a petition with this court for a peremptory or alternative writ of mandamus directing the trial court to vacate its order granting Crimson's motion to compel and to issue a new order denying that motion. This court granted an alternative writ, ordering the trial court to vacate its order or show cause for not doing so.

The trial court declined to vacate its order and issued an opinion explaining that decision. In the opinion, the trial court announced the following factual findings:

> "The internal law firm communications at issue were made during the time defendant [DWT] represented plaintiff Crimson * * * in a patent infringement action pending in federal court (the LaserMax litigation). The communication consisted primarily of emails between the DWT lawyers representing Crimson * * * in the LaserMax litigation, and the DWT lawyers on the firm's [QAC]. The communications addressed Crimson['s] decision to stop paying its legal bills and its dissatisfaction (and potential claim against DWT) based on the firm's handling of the LaserMax litigation.

> "The DWT lawyers intended that those communications would be confidential and not disclosed to Crimson * * *. The DWT lawyers on the [QAC] were not directly involved in the firm's ongoing representation of Crimson * * * in the LaserMax litigation. The lawyers representing Crimson * * * in the litigation communicated with the lawyers on the [QAC] about the LaserMax litigation. Some of those communications concerned court filings in the Lasermax litigation. DWT did not disclose a potential conflict to Crimson * * * or seek its consent to DWT's continued representation of Crimson * * * in the LaserMax litigation, nor did DWT seek to withdraw from its representation of Crimson * * * in that litigation."

Based on those findings, the trial court concluded that the DWT lawyers representing Crimson "could have an attorney-client relationship with the DWT lawyers on the firm's [QAC], so that communications among the DWT lawyers ordinarily would be covered by the attorney-client privilege." The court also concluded, however, that a "fiduciary exception" to the attorney-client privilege applied. The court explained that because of DWT's duties of candor, disclosure, and loyalty to Crimson as its client, the firm was precluded from asserting the attorney-client privilege as to its internal communications. The court noted that the issue was one of first impression in Oregon, but that it was persuaded by arguments that the "better rule" required DWT's claim of privilege to give way to its "paramount duties to Crimson * * * under the circumstances presented here."

## II. ANALYSIS

In its mandamus petition, DWT argues that the trial court erred in recognizing a "fiduciary exception" to the attorney-client privilege. According to DWT, OEC 503 is the sole source of law that is relevant to this, and any other, controversy about the attorney-client privilege as it applies in this state, and that the so-called fiduciary exception is not among the exceptions to the privilege that are enumerated in that rule. DWT contends that, insofar as the communications at issue here fall squarely within the general privilege as defined in OEC 503 and do not fall into any of the enumerated exceptions, the trial court was precluded from concluding that the attorney-client privilege is inapplicable and that the communications are subject to discovery.

In its response, Crimson first contends that we do not need to decide whether to recognize a "fiduciary exception" to the attorney-client privilege, because the communications at issue do not fall within the privilege in the first place. Relying on case law concerning the Oregon Rules of Professional Conduct, Crimson argues that the privilege depends on the existence of an attorney-client relationship, and that whether an attorney-client relationship exists depends in turn on the client's "reasonable expectation" that he or she is entitled to look to the lawyer for advice. In this case, Crimson argues, Birdwell and Boundy had no such reasonable expectation with respect to the QAC, because they knew that their interests were adverse to Crimson's, a then-current client.

In the alternative, Crimson argues that, even assuming that an attorney-client relationship exists and the communications fall within the general privilege, the "fiduciary exception" applies. In Crimson's view, the fact that OEC 503 itself does not include that exception does not preclude this court from recognizing additional exceptions to the attorney-client privilege as set out in that rule.

### A. *Availability of mandamus*

Mandamus is a statutory remedy aimed at correcting errors of law for which there is no other "plain, speedy and adequate remedy in the ordinary course of the law."

ORS 34.110. A trial court decision ordering the disclosure of privileged information is subject to review in mandamus precisely because ordinary appeal provides an inadequate remedy. As the court explained in *State ex rel OHSU v. Haas*, 325 Or 492, 497, 942 P2d 261 (1997), "[o]nce a privileged communication has been disclosed, the harm cannot be undone." As a result, "[m]andamus is an appropriate remedy when a discovery order erroneously requires disclosure of a privileged communication." *Id.*

B. *Whether the attorney-client privilege applies*

We turn, then, to the merits of the parties' dispute, beginning with the question whether the attorney-client privilege described in OEC 503 applies at all. At the outset, we emphasize that, in this case, the issue is governed by statute: OEC 503, codified at ORS 40.225. Although the rules of evidence are commonly denominated "rules," they were—unlike other rules, such as some of the Oregon Rules of Civil Procedure—adopted by the legislature. Accordingly, in construing OEC 503, our task is to determine what the legislature intended, using our traditional analytical framework, which focuses on the statute's text, context, and any helpful legislative history. *See State v. Serrano*, 346 Or 311, 318-25, 210 P3d 892 (2009) (applying interpretive framework described in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), to OEC 505); *State ex rel OHSU*, 325 Or at 501 (citing and applying *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), in interpreting OEC 503).

OEC 503 defines relevant terms and sets out the attorney-client privilege as follows:

"(1)    As used in this section, unless the context requires otherwise:

"(a)    'Client' means a person, public officer, corporation, association or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer * * * with a view to obtaining professional legal services.

"(b)    'Confidential communication' means a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the

rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

"(c)   'Lawyer' means a person authorized or reasonably believed by the client to be authorized, to practice law in any state or nation.

"\* \* \* \* \*

"(2)   A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose facilitating the rendition of professional legal services to the client:

"(a)   Between the client or the client's representation and the client's lawyer or a representative of the lawyer."

In *State v. Jancsek*, 302 Or 270, 275, 730 P2d 14 (1986), this court concluded that, under OEC 503, a claim of privilege generally may be asserted with respect to a communication if three requirements are satisfied. First, the communication must have been between a "client" and the client's "lawyer," as those terms are defined in OEC 503(1)(a) and (c). Second, the communication must have been a "confidential communication," as that term is defined in OEC 503(1)(b). Finally, the communication must be "made for the purpose facilitating the rendition of professional legal services to the client." OEC 503(2).

Crimson insists that a fourth requirement must be satisfied for the attorney-client privilege under OEC 503 to apply. In Crimson's view, OEC 503 implicitly assumes the existence of an attorney-client "relationship," which Crimson contends depends on the "reasonable expectations" of the parties. In this instance, Crimson argues, Birdwell and Boundy could not reasonably have believed that their conversations with their firm's QAC created an attorney-client relationship, because no lawyer could reasonably expect another member of his or her firm to represent the lawyer in his or her conflict with a current client. That is so, Crimson argues, because the Oregon Rules of Professional Conduct prohibit the lawyer from representing a client when that representation might be adverse to another client.

In support of that argument, Crimson relies on statements in this court's prior cases concerning the Oregon Rules of Professional Conduct to the effect that the existence of an attorney-client relationship is determined by the reasonable expectations of the client. *See In re Weidner*, 310 Or 757, 770, 801 P2d 828 (1990) ("[T]o establish that the lawyer-client relationship exists based on reasonable expectation, a putative client's subjective *** intention or expectation must be accompanied by evidence of objective facts on which a reasonable person would rely as supporting existence of that intent."); *Kidney Association of Oregon v. Ferguson,* 315 Or 135, 145, 843 P2d 442 (1992) ("The existence of a lawyer-client relationship primarily is determined by the reasonable expectation of the client that the lawyer will perform legal work in the client's behalf."); *In re Spencer*, 335 Or 71, 84, 58 P3d 228 (2002) ("'The modern trend in Oregon and elsewhere is to find the existence of an attorney-client relationship whenever the would-be client reasonably believes under the circumstances that the client is entitled to look to the lawyer for advice.'" (quoting the *Ethical Oregon Lawyer,* 6.3 (Oregon CLE 1991))).

Crimson's reasoning is unpersuasive for at least two reasons. First, and most important, it finds no support in the wording of OEC 503. Nothing in the rule mentions a requirement that the existence of an attorney-client relationship sufficient to trigger the privilege depends on the reasonableness of the parties' expectations. To be sure, the rule does mention reasonableness in defining who is a "lawyer." But it uses the term in reference to the client's believe that a person is "authorized to practice law in any state or nation." OEC 503(1)(c). There is a difference between the reasonableness of a client's belief that an individual is authorized to practice law at all and the reasonableness of the client's belief that the individual is authorized to be that client's lawyer. The terms of the rule refer only to the former, not the latter.

In arguing to the contrary, Crimson relies on this court's lawyer-discipline cases. Those cases, however, have no necessary relevance to the question of OEC 503's applicability. While it may be true that the attorney-client privilege

set out in OEC 503 requires the existence of an "attorney-client relationship" in *some* sense—after all, the rule defines "client" and "lawyer" and provides that the privilege applies to communications between them—there is no reason to believe that the existence of such a relationship for purposes of OEC 503 would be determined by the same analysis that applies in the disciplinary context. Rather, OEC 503 *itself* describes what is required.

Second, Crimson misconstrues the attorney discipline cases on which it relies. Those decisions support the idea that an attorney-client relationship *may* be found to exist based on the would-be client's reasonable expectation of representation. However, none of them stand for the entirely different proposition that Crimson advances—that an attorney-client relationship can exist *only* if the putative client reasonably believes that he or she can look to the lawyer for advice and representation. In fact, *Weidner* and *Spencer* both suggest that the existence of an attorney-client relationship is usually a matter of the parties' expressed intentions, and that the reasonableness of the client's *expectation* of representation becomes an issue only when the lawyer denies that the relationship existed at the relevant time. *See Spencer*, 335 Or at 84-85 (although lawyer ultimately decided not to represent person who sought his advice, the person nevertheless became the lawyer's client for the limited purpose of safeguarding the documents that she had turned over to lawyer, because it was reasonable for the person to believe that lawyer would return them upon her request); *see also Weidner*, 310 Or at 770 (where there was no evidence of any express lawyer-client relationship, relationship still could be established based on client's reasonable expectation based on objective facts). It appears, then, that the reasonableness of the putative client's expectation of representation is irrelevant when, as in this case, the client and lawyer mutually agree that an attorney-client relationship has been formed.

We turn, then, to whether the communications at issue in this case satisfy the three requirements set out in OEC 503(2). It is important to note, in approaching that issue, that the trial court concluded that the communications

fell within the privilege as defined by OEC 503(2): It stated that the communications "ordinarily would be covered by the attorney-client privilege," but were excepted under the "fiduciary exception." In reviewing that conclusion, we are bound by the court's factual findings as long as the record contains evidence that supports those findings. To the extent that the trial court did not explicitly state its factual findings, we assume that it found facts consistent with its conclusion (assuming, again, that the evidence in the record would support such findings). *State ex rel OHSU,* 325 Or at 498.

1. *Was the communication between a "client" and the client's "lawyer"?*

No one contests that Birdwell and Boundy could have consulted with lawyers outside of their firm and that such consultations would be subject to the attorney-client privilege. The issue in this case is whether Birdwell and Boundy's consultations with the members of the QAC *of their own firm* constituted communications between a "client" and the client's "lawyer" as those terms are defined in OEC 503(1). That the members of the QAC are "lawyers" within the meaning of OEC 503(1)(c)—that is, that they are "authorized * * * to practice law"—is not in dispute. That leaves the question whether Birdwell and Boundy were the QAC's "clients" within the meaning of OEC 503(1)(a).

At the outset, we note that nothing in the wording of OEC 503 or the case law construing it suggests that a law firm, or one or more of its individual lawyers, cannot be the "client" of the firm's in-house counsel. To the contrary, this court has recognized that an organization can be the "client" of its own in-house counsel within the meaning of OEC 503(1)(a). *See State ex rel OHSU,* 325 Or at 500 (OHSU was the client of its own in-house counsel).

In this case, although the trial court made no explicit factual findings that are relevant to this issue, it did state the legal conclusion that, but for the "fiduciary exception," Birdwell and Boundy could have had an attorney-client relationship with the firm's QAC and that, as a result, those communications "ordinarily would be covered by the

attorney-client privilege." That determination suggests an implicit factual finding that Birdwell and Boundy "consult[ed] a lawyer with a view to obtaining professional legal services." OEC 503(1)(a). And that implicit finding is supported by evidence in the record: QAC member Thurber's affidavit explained that the members of the QAC "act as in-house counsel for the firm and its lawyers." And Birdwell and Boundy both submitted declarations to the trial court stating that they had consulted with the QAC "for the purposes of obtaining legal advice regarding [their] professional responsibilities and other matters relating to the *LaserMax* case."

*Amicus*, the Oregon Trial Lawyers Association (OTLA), contends that DWT and its individual lawyers should not be deemed the QAC's "clients" within the meaning of OEC 503(1)(a), because doing so would essentially condone DWT's violation of its duty of loyalty to its current client and undermine a client's sense of security in frankly communicating with his or her own lawyers.

We are not persuaded. OTLA's argument is essentially one of policy. Our task is one of statutory interpretation. As this court has cautioned in previous cases, "[t]his court's statutory construction methodology, not policy considerations," guides our determination of the meaning of statutes. *Johnson v. Swaim*, 343 Or 423, 430, 172 P3d 645 (2007); *Rodriguez v. The Holland, Inc.*, 328 Or 440, 446, 980 P2d 672 (1999). In the absence of an explanation as to how the wording of OEC 503(1)(a) supports the result that OTLA seeks, we reject its contention that that definition does not apply to Birdwell and Boundy.

We conclude that the communications at issue were "between the client * * * and the client's lawyer," OEC 503(2) (a), and that, as such, the first requirement for placing a communication within the attorney client privilege is satisfied.

2. *Were the communications "confidential communications"?*

To qualify for the attorney-client privilege as defined at OEC 503(2), a communication must be a "confidential communication," that is, a communication "not intended to be

disclosed to third persons." OEC 503(1)(b). In this case, the trial court expressly found that "[t]he DWT lawyers intended that those communications would be confidential and not disclosed to Crimson * * *." That finding is supported by the affidavits of Birdwell and Boundy, both of whom stated that their meetings with members of the firm's QAC "were intended to be confidential." Because the trial court's finding is supported by evidence in the record, we are bound by it. *Serrano*, 346 Or at 326.

Crimson suggests that, regardless of the trial court's finding, the requirement that the communication be a "confidential communication" was not satisfied. Crimson's reasoning is as follows: Most of the communications being sought in discovery were communications between Boundy and his primary contact at the QAC, Johnson. Boundy and Johnson are both Washington lawyers, and the communications in question occurred in Washington state. The Washington courts have concluded that internal communications between a law firm and its in-house lawyers about a conflict with a current client may not be protected by the attorney-client privilege in a malpractice action brought by the client. *VersusLaw, Inc. v. Stoel Rives, LLP*, 127 Wn App 309, 111 P3d 866 (2005), *rev den*, 156 Wn 2d 1008, 132 P3d 147 (2006). Given that state of the law in the jurisdiction where the communications occurred and where Boundy and Johnson were licensed to practice law, those two lawyers could not have "reasonably" intended to keep their communications secret.

Crimson's reasoning is unpersuasive. Washington law has no bearing on the meaning of OEC 503(1)(b). Whether or not the communications at issue occurred in Washington, the litigation concerning those statements is taking place in Oregon. It is well established in this state that Oregon applies its own rules prescribing how litigation shall be conducted, including its own evidentiary rules. *Equitable Life Assurance v. McKay*, 306 Or 493, 497-98, 760 P2d 871 (1988).

We therefore accept the trial court's finding that the various DWT lawyers who were involved in the communications at issue intended to keep the communications

confidential. The second requirement for assertion of the attorney-client privilege is satisfied.

3. *Were the communications "made for the purpose of facilitating the rendition of professional legal services to the client"?*

As we have noted, the court expressly found that, but for the "fiduciary exception," the attorney-client privilege would apply. Moreover, in addressing the question whether particular materials listed in the privilege log were subject to the attorney-client privilege, the court found that, with the exception of three documents, the balance of the materials that Crimson requested reflected the fact that the firm and its lawyers "had a separate interest, and the lawyers who were representing Crimson * * * were intending to communicate to members of the [QAC] regarding [DWT's] separate interest." That would appear to be a finding that those communications were made for the purpose of facilitating the rendition of professional legal services to the QAC's client, DWT.

That finding is supported by evidence in the record, including the uncontradicted affidavits of Birdwell and Boundy that their communications with the firm's QAC "were made for the purpose of facilitating the rendition of professional legal services" and "obtaining legal advice regarding the fulfillment of [their] professional responsibilities and other matters relating to the *LaserMax* case." Accordingly, we conclude that, except for the first three communications listed on the privilege log, the third requirement is satisfied.

We have determined that, except for the three communications just mentioned, the communications at issue satisfied the three requirements set out in OEC 503(2) for application of the attorney-client privilege, and we therefore accept the trial court's conclusion that those communications "ordinarily" would fall within the privilege. We turn, then, to the question whether those communications were nevertheless subject to a "fiduciary exception" to the attorney client privilege stated in OEC 503.

## C. *Do the communications fall within a recognized exception to the attorney-client privilege?*

OEC 503(4) provides that "[t]here is no [lawyer-client] privilege" in five circumstances:

"There is no privilege under this section:

"(a) If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud;

"(b) As to a communication relevant to an issue between parties who claim through the same deceased client * * *;

"(c) As to a communication relevant to an issue of breach of duty by the lawyer to the client or by the client to the lawyer;

"(d) As to a communication relevant to an issue concerning an attested document to which the lawyer is an attesting witness or

"(e) As to a communication relevant to a matter of common interest between two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between any of the clients."

In this case, there is no contention that any of the foregoing five exceptions to the attorney-client privilege applies to DWT's communications with its QAC. The trial court, however, recognized an additional exception—denominated a "fidicuary exception"—and concluded that that exception applied to the circumstances of this case.

The trial court explained that a number of courts that have addressed the issue have concluded that, because of the fiduciary obligations that a law firm owes its clients, a firm may not invoke the attorney-client privilege to protect communications between its lawyers and its in-house counsel from the firm's clients. The court stated that the exception to the usual rule that privileges attorney-client communications that such courts have recognized represents the "better rule," which it suggested this court should adopt.

Crimson defends the trial court's assessment, contending that the "vast majority of courts" have adopted the exception.

What is commonly referred to as the "fiduciary exception" to the attorney-client privilege is a judicially created rule that originated in English trust cases in the mid- to late-nineteenth century. *See, e.g., Wynne v. Humberston*, 27 Beav 421, 423-24, 54 Eng Rep 165, 166 (1858). The rule was that a trustee who obtained legal advice concerning the administration of the trust was required to disclose that advice to beneficiaries of that trust. The attorney-client privilege was held not to apply between the trustee and the attorney because of the attorney's fiduciary relationship with the beneficiaries, for whose benefit the advice presumably was obtained. *Id.*

The rule found some acceptance among American courts in the 1970s. *See, e.g., Garner v. Wolfinbarger*, 430 F2d 1093, 1101-04 (5th Cir 1970) (discussing whether privilege attaches to communications between corporate management and corporate counsel in lawsuit brought by stockholders); *Riggs Nat. Bank of Washington, D.C. v. Zimmer*, 355 A2d 709 (Del Ch 1976) (discussing whether attorney-client privilege bars disclosure by trustee to trust beneficiary of legal memoranda prepared by lawyer at trustee's request). The reasoning has been extended to circumstances other than trusts in subsequent cases—in particular, to cases in which a lawyer claims a privilege as to communications with in-house counsel. A number of courts have adopted the rule that a law firm cannot assert the attorney-client privilege against a current client when self-representation would create a conflict of interest with that client. *See, e.g., Sonicblue Inc. v. Portside Growth & Opportunity Fund*, 2008 Bankr LEXIS 181 (where conflicting duties to firm's lawyers and current outside client of firm exist, "the law firm's right to claim privilege must give way to the interest in protecting current clients who may be harmed by the conflict."); *Thelen, Reid & Priest LLP v. Marland*, 2007 US Dist LEXIS 17482 (ND Cal 2007) (law firm's fiduciary obligations to client did not allow it to protect internal communications about client); *Koen Books Distribs. v Powell, Trachman, Logan,*

*Carrle, Bowman & Lombardo, P.C.*, 212 F R D 283, 286 (ED Pa 2002) (attorney-client privilege not applicable in context of conflict with current client because firm's fiduciary duty to outside client was "paramount to its own interest"); *In re Sunrise Securities Litigation*, 130 F R D 560 (E D Pa 1989) (consultation with in-house counsel created conflict of interest for firm that vitiated attorney-client privilege that otherwise would attach to intra-firm communications).

Other courts, however, have declined to adopt the fiduciary exception to the attorney-client privilege. Some have done so on the ground that they are not persuaded by the reasoning offered in support of the exception. *See, e.g.*, *St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, PC*, 293 Ga 419, 425, 746 SE2d 98, 105-06 (2013) ("[T]he potential existence of an imputed conflict of interest between in-house counsel and the firm client is not a persuasive basis for abrogating the attorney[-]client privilege between in-house counsel and the firm's attorneys."); *RFF Family Partnership, LP v. Burns & Levinson, LLP*, 465 Mass 702, 716, 991 NE2d 1066, 1076 (2013) ("[A] client is not entitled to revelation of the law firm's privileged communications with in-house or outside counsel * * * if those communications were conducted for the law firm's own defense against the client's adverse claims."); *Garvy v. Seyfarth Shaw LLP*, 966 NE2d 523, 536 (Ill App 2012) ("Illinois has not adopted the fiduciary-duty exception to the attorney-client privilege. The cases relied on * * * do not persuade us to create new law in Illinois by adopting it here.").

Others have rejected it on the ground that, because the attorney-client privilege is stated in a legislatively adopted evidence code, courts lack authority to create such *ad hoc* exceptions to it. *See, e.g.*, *Wells Fargo Bank v. Superior Court*, 22 Cal 4th 201, 206, 990 P2d 591, 594 (2000) (rejecting fiduciary exception because "[t]he privileges set out in the Evidence Code are legislative creations; the courts of this state have no power to expand them or to recognize implied exceptions"); *Estate of Barbano v. White*, 800 NY S2d 345, 2004 N Y Misc LEXIS 3016 (NY Sup 2004) (noting that fiduciary exception had been largely eliminated by legislative amendments to evidence code).

In that regard, it bears emphasis that, among the courts that have adopted the fiduciary exception, most are not governed by a legislatively adopted privilege; most of the cases adopting the exception are federal. *See Wells Fargo Bank*, 22 Cal 4th at 208, 990 P2d at 595 (so noting). Under federal law, the attorney-client privilege is recognized as judge-made and, as a result, is subject to judge-made exceptions. *See generally* Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 5:1, 405 (3d ed 2007) ("Congress decided to leave privilege law where it was, and yet without freezing the evolution of the common law relating to privileges."); *see also Trammel v. U.S.*, 445 US 40, 47, 100 S Ct 906, 63 L Ed 2d 186 (1980) (federal rules allow courts to develop privilege law "on a case-by-case basis"). Indeed, among federal courts addressing the issue as a matter of *state* law, the result has not been as uniform as Crimson suggests. *See, e.g., Tattletale Alarm Systems, Inc. v. Calfee, Halter & Griswold*, 2011 WL 382627 (SD Ohio 2011) (applying Ohio law, declining to adopt fiduciary exception); *Murphy v. Gorman*, 271 F R D 296, 318-19 (D NM 2010) (applying New Mexico law, declining to adopt fiduciary exception because of lack of authority to recognize exceptions not listed in state evidence code).

With the foregoing in mind, we turn to the question whether to recognize a fiduciary exception to the attorney-client privilege set out in OEC 503. We begin by recalling that OEC 503 is a statute, enacted into law by the legislature. Accordingly, the scope of the privilege—as well as any exceptions to it—is a matter of legislative intent. *See, e.g., Serrano*, 346 Or at 318 (scope of evidentiary privilege and its exceptions governed by ordinary principles of statutory construction).

In some cases, discerning the legislature's intentions with respect to the scope of exceptions is straightforward. When, for example, statutory lists of conditions or exceptions are preceded by the phrase "including, but not limited to," courts readily acknowledge that such legislation is not exhaustive. *See State v. Kurtz*, 350 Or 65, 75, 249 P3d 1271 (2011) ("statutory terms such as * * * 'including but not

limited to' \* \* \* convey an intent that an accompanying list of examples be read in a nonexclusive sense").

In other cases, legislation may set out a rule, but say nothing one way or the other about exceptions. The historical context of the enactment nevertheless may make clear that the legislature did not intend to foreclose the courts from adopting them. *See Hatley v. Stafford*, 284 Or 523, 526 n 1, 588 P2d 603 (1978) (holding that the legislature, in adopting the parol evidence rule without mention of any exceptions, intended to codify the existing common-rule, but not to preclude judicial recognition of exceptions to it).

In this case, OEC 503(4) enumerates five circumstances in which "[t]here is no privilege under this section." The rule says nothing about the authority of the courts to add to those five exceptions. To the contrary, by taking the trouble to enumerate five different circumstances in which there is no privilege, the legislature fairly may be understood to have intended to imply that no others are to be recognized. That much follows from the application of the familiar interpretive principle of *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of others). *See, e.g., Waddill v. Anchor Hocking, Inc.*, 330 Or 376, 381-82, 8 P3d 200 (2000) (applying canon to text of rule of civil procedure); *Fisher Broadcasting, Inc. v. Dept. of Rev.*, 321 Or 341, 353, 898 P2d 1333 (1995) (applying canon to text of statute).

Of course, care must be taken in applying that principle. The mere expression of one thing does not *necessarily* imply the exclusion of all others. A sign outside a restaurant stating "No dogs allowed" cannot be taken to mean that any and all other creatures are allowed—including, for example, elephants, tigers, and poisonous reptiles. The *expressio unius* principle is simply one of inference. And the strength of the inference will depend on the circumstances. For example, the longer the list of enumerated items and the greater the specificity with which they are stated, the stronger the inference that the legislature intended the list to be exhaustive. *See generally* Antonin Scalia and Bryan A. Garner, *Reading Law*: *The Interpretation of Legal Texts* 108 (2012) ("The

more specific the enumeration, the greater the force of the canon."). Also relevant is whether something is stated in one portion of the statute, but excluded in another; the fact that the legislature took the trouble to include a provision in one part of the statute strongly supports the inference that any exclusion elsewhere in the statute is intentional. Norman Singer and J.D. Shambie Singer, 2A *Sutherland Statutes and Statutory Construction* § 47:23, 417 (7th ed 2007) ("The force of the maxim is strengthened where a thing is provided in one part of the statute and omitted in another.").

In this case, the negative inference is especially strong for three reasons. First, the enumerated list is not short or general. OEC 503(4) sets out a list of five different circumstances in which the privilege does not apply and spells them out in some detail.

Second, the Oregon Evidence Code includes other evidentiary privileges that use the same basic drafting convention of stating the privilege and then listing exceptions to the privilege. In two cases, however, the list of exceptions is preceded by a statement that the list is not exclusive. Thus, for example, OEC 504(2) sets forth the psychotherapist-patient privilege. OEC 504(4) then lists four exceptions to that privilege, preceded by the statement that "[t]he following is a *nonexclusive* list of limits on the privilege granted by this section." (Emphasis added.) Similarly, OEC 504-1(2) recognizes a physician-patient privilege. It is followed by OEC 504-1(4), which lists three exceptions to the privilege, preceded by the statement that "[t]he following is a *nonexclusive* list of limits on the privilege granted by this section." (Emphasis added.) In the context of those rules, the fact that OEC 503(4) enumerates a list of exceptions without the statement that the list is nonexclusive appears to confirm the negative inference that the list was intended to be exhaustive.

Third, this court has read a similarly worded list of exceptions to another privilege recognized by the Oregon Evidence Code as precluding the recognition of exceptions not included in the code. OEC 505(2) and (3) recognize a husband-wife evidentiary privilege. The statement of the privilege

is followed by OEC 505(4), which lists three exceptions under which "[t]here is no privilege under this section." Those three exceptions are: (1) in all criminal actions in which one spouse is charged with committing or attempting to commit any of several listed offenses against the other spouse; (2) as to matters occurring before the marriage; and (3) in any civil action in which the spouses are adverse parties. *Id.* In *Serrano,* a murder case, the state offered the inculpatory testimony of the defendant's wife concerning things that the defendant had said in the course of conversations about the dissolution of their marriage. The defendant objected on the basis of the husband-wife privilege. The state argued that the privilege did not apply. The state reasoned that, because the historical purpose of the privilege was to preserve marriages, communications regarding the dissolution of a marriage should not be privileged. 346 Or at 319-21. This court rejected the state's argument, noting that "the legislature set out three specific exceptions to the marital privileges, but did not provide for any 'marital health' exception." *Id.* at 320. In the court's view, "the omission of a 'marital health' exception in OEC 505(4) is decisive." *Id.* at 321.

Crimson insists that there is evidence that the legislature did *not* intend OEC 503(4) as a complete listing of exceptions to the privilege. In support, Crimson relies on legislature commentary to OEC 503(4), which, after describing the five enumerated exceptions to the attorney-client privilege, adds:

> "Oregon law recognizes two other exceptions to the lawyer-client privilege—an exception for assets left with the attorney, *State ex rel Hardy v. Gleason,* 19 Or 159, 23 P 817 (1890), and an exception for the fact of employment and name and address of the client, *Cole v. Johnson,* 103 Or 319, 205 P 282 (1922); *In re Illidge,* 162 Or 393, 91 P2d 1100 (1939). By the adoption of Rule 503, the Legislative Assembly does not intend to affect these latter exceptions."

OEC 503 Commentary (1981). Crimson asserts that, because the commentary adverts to two specific "exceptions" that are not enumerated in the rule, the rule must contemplate the recognition of other exceptions.

We are not persuaded. First, the commentary recognizes two specific, unenumerated exceptions, and no others. It does not necessarily follow from the stated intention not to eliminate the two exceptions that the legislature also intended to recognize other exceptions. In fact, it is at least equally plausible that the commentary was intended to recognize only the two exceptions that it explicitly mentions. Second, and in any event, the two "exceptions" that are identified in the commentary are not really exceptions at all, but circumstances that this court has found are not within the scope of the attorney-client privilege in the first place. *See In re Illidge*, 162 Or 393, 405, 91 P2d 1100 (1939) ("The privilege itself was to extend only to communications between a client and an attorney who had been retained. The name or identity of the client was not the confidence which the privilege was designed to protect."); *State ex rel. Hardy v. Gleason*, 19 Or 159, 162, 23 P 817 (1890) (the client already having admitted that he possessed certain assets, answers to questions about the disposition of those assets left with an attorney "were not privileged").

Crimson argues that failing to recognize an exception for these circumstances would be "absurd" because it would allow a lawyer to breach his or her duty of loyalty to the client and then "compound the conflicts of interest by communicating with other lawyers in his firm that not only indirectly through imputation represent the client, but actually and directly represent the client on the very same matter, and then shield those internal communications from disclosure to the client." But, once again, Crimson conflates ethical considerations with the separate issue of the scope of the privilege set out in OEC 503.

This court's opinion in *State v. Miller*, 300 Or 203, 709 P2d 225 (1985), is instructive on the distinction between rules of professional conduct and rules of evidence. In that case, the defendant killed another person and, shortly after, telephoned a psychiatrist, to whom he confessed. The psychiatrist later disclosed to police that the defendant had told her that he had murdered someone. The defendant moved to suppress the evidence, asserting the psychotherapist-patient privilege recognized in OEC 504. The trial court recognized

the privilege, but rejected the application in the circumstances, based, apparently, on a recognition that psychotherapists have an ethical obligation to divulge a patient's confidences when necessary to aid the victim of a patient's violence. *Id.* at 215.

This court rejected the trial court's reasoning. The court held that the conversations between the defendant and the psychiatrist were plainly subject to the evidentiary privilege. *Id.* It then noted that OEC 504 specifically included exceptions to that privilege, but that there was no such exception based on the therapist's ethical obligation to divulge patient confidence under the circumstances of that case. *Id.* at 216. "It is important to distinguish," the court explained,

"between the evidentiary privilege which is claimed by a patient, or a psychotherapist [o]n behalf of a patient, to prevent disclosure of confidential information *at trial*, and the discretionary authority of a public health care provider or any ethical obligation that a licensed psychotherapist may have to notify the police or other proper authority in order to aid a victim or warn of future dangerousness."

*Id.* at 215-16 (emphasis in original).

The same reasoning applies in this case. As in *Miller*, rules of professional conduct may require or prohibit certain conduct, and the breach of those rules may lead to disciplinary proceedings. But that has no bearing on the interpretation or application of a rule of evidence that clearly applies.

We conclude that OEC 503(4) was intended as a complete enumeration of the exceptions to the attorney-client privilege. Insofar as that list does not include a "fiduciary exception," that exception does not exist in Oregon, and the trial court erred in relying on that exception to compel production of communications that otherwise fell within the general scope of the privilege. It follows that the trial court's order must be vacated to the extent that it orders production of communications that were otherwise within the privilege. The trial court remains free, however, to order production of the three communications that it found were *not* within

the general scope of the privilege because, in essence, those communications were *not* made for the purpose of facilitating the rendition of professional legal services to DWT.

Peremptory writ to issue.