No. 15 March 9, 2017 205

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Adverse Party,*

*v.*

MARK LYLE MOORE,
aka Mark Lyle Moore, Sr.,
*Defendant-Relator.*

(CC 14CR12536, SC S063946)

En Banc

Original proceeding in mandamus.*

Argued and submitted October 13, 2016.

Laura Graser, Portland, argued the cause and filed the brief for defendant-relator.

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause and filed the brief for plaintiff-adverse party. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

BALDWIN, J.

Peremptory writ of mandamus to issue.

_____
* On petition for a writ of mandamus from an order of Multnomah County Circuit Court, Christopher J. Marshall, Judge.

**BALDWIN, J.**

In this original proceeding, relator (defendant), who is a defendant in the underlying criminal case, seeks a writ of mandamus directing the trial court to dismiss the indictment against him with prejudice, based on former or double jeopardy under state and federal law. After a jury was impaneled and several witnesses for the state had testified, the trial court declared a mistrial. When the state sought a retrial, defendant moved to dismiss the indictment on jeopardy grounds, and the trial court denied his motion. The issue before us now is whether, under Article I, section 12, of the Oregon Constitution, there was "manifest necessity" for the trial court's mistrial order. For the reasons that follow, we conclude that the state has not met its burden of demonstrating that the trial court's mistrial was consistent with the "manifest necessity" standard. We therefore direct the issuance of a peremptory writ of mandamus requiring the trial court to dismiss the indictment with prejudice.

## BACKGROUND

This petition arises out of criminal charges involving defendant, codefendant Golden, and a third defendant, Richardson. All three men allegedly played a role in the arson-related death of the victim. Defendant and codefendant Golden presently face retrial, after the trial court declared a mistrial over defendant's objection and dismissed the charges against both men without prejudice. The state sought to proceed with a retrial against both defendants on multiple counts of murder and first-degree arson. Prior to the first trial, Richardson, the third defendant, pleaded guilty to a single count of third-degree assault as part of an agreement to cooperate with police authorities and testify against the codefendants.

In February 2011, Richardson was living—with the owner's consent—in a small detached garage located next to a house. Unbeknownst to the owner, however, Richardson had allowed the victim, Purcell, to stay in the garage as well. One night, a fire broke out in the garage with the victim inside. Firefighters arrived, removed Purcell from the burning structure, and put the fire out. Purcell, however, died of smoke inhalation some time later.

In the fire investigation that followed, state fire authorities found blood on the floor of the garage, along with numerous syringes, discoveries that subsequently prompted the intervention of Portland homicide investigators. An autopsy revealed that Purcell had died of asphyxia from inhaling smoke and carbon monoxide, but the state investigators who examined the fire scene were not able to find any arson-related indicators. One investigator and his accelerant-sniffing K-9 partner searched in vain for evidence that an accelerant had been used to start the fire. Instead, what the investigator found was a structure that he concluded was a "firetrap," a space littered with combustible materials, multiple plugged-in extension cords, and several locations where a fire could have started accidentally.

Shortly after the fire, Richardson recounted the events of that evening to investigators and stated that the fire had apparently been an accident. Two months later, however, Richardson—who had been jailed on charges not specified on this record—confessed to police that he had entered the garage and beaten up the victim on the night of the fire. According to Richardson's new account, defendant and codefendant Golden arrived at the garage and started the fire after Richardson had left the area. Defendant and Golden were subsequently indicted on murder and arson charges; Richardson was released from jail and charged with third-degree assault.

According to defendant, at the beginning of trial, he was confident about his trial strategy. In opening statements, defendant's trial counsel had asked the jury to carefully consider the "pros and cons" of the evidence that would come before it in determining whether the fire that had killed the victim was arson or an accident. The "pros" were the state fire investigators who had examined the burned-out garage in the wake of the victim's death. Counsel indicated that they would uniformly testify that the cause of the fire was undetermined, that there was no physical evidence linking defendant to the victim's death, and that there would be no expert testimony indicating that the fire was the result of arson. The "cons," in contrast, constituted many of the prosecutor's other witnesses—incarcerated individuals who, burdened with lengthy criminal histories and pending

criminal charges, were highly motivated to provide favorable testimony for the state in exchange for certain considerations regarding their sentences and the charges against them.

The state called its first eight witnesses, among them, the firefighting personnel who had been at the crime scene, and local a resident, Thomas. At one point, Thomas testified that she had seen defendant and codefendant Golden leaving the garage shortly before it caught fire, but made other statements that conflicted with that testimony. Ultimately, Thomas acknowledged that, at the time of the fire, she had been awake on crystal methamphetamine for approximately 24 hours and that the drug affected her memory.

At the end of the first day of trial, the prosecutor stated that he was "still trying to track down information on the arson—the fire investigation from the insurance company." On the next day of trial, the prosecutor stated that he had discovered a new witness and new evidence that he now wished to present as part of the state's case-in-chief:

> "[A]s you recall, last week, Thursday, the state apprised the Court and defense counsel that it had become aware that there is potentially information from the insurance company that an investigator, a fire investigator, did a complete investigation and made a determination as to the source and cause of the fire, and that's all we knew at that time."

According to the prosecutor, he was still awaiting the recently subpoenaed insurance file but had, in the interim, spoken with insurance investigator Gunsolly and procured the investigator's notes. The handwritten notes, which the prosecutor gave to the trial court and opposing counsel, contained the names of different fire and police officials involved with the post-fire investigation, along with the names of various potential witnesses. The prosecutor stated that, during his conversation with the insurance investigator, the investigator

> "had ruled out that this was a fire that was caused by electrical purposes and that he believe that a handheld, open source flame was used to light some materials in the garage

to start the fire. In essence, my interpretation of that is he believed that somebody intentionally started the fire, that it was not accidental."

Both defendants moved to exclude the prosecutor's new evidence, arguing that to do otherwise would not only be fundamentally unfair, but would also "encourage the state to remain willfully blind to something that was in discovery." Defendant nevertheless rejected the possibility of a mistrial, arguing that, "we do not want a mistrial" because "the defense is always prejudiced when they have to retry the case." The trial court, however, denied the motion to exclude, ruling that the new evidence would be admitted.[1]

Codefendant Golden's counsel, opining that he was obligated to do so, responded by moving for a mistrial. Defendant did not join in that motion; his counsel stated, "We don't want a mistrial. We like this jury; we like how we're doing." Counsel later reiterated, "[W]e are not joining [codefendant's] motion; we are not seeking a mistrial. That is done in consultation with our client." The trial court then granted codefendant Golden's motion for a mistrial, on its own motion declared a mistrial as to defendant, and dismissed the jury. Shortly thereafter, the state reindicted both defendants.

Defendant subsequently moved to dismiss the indictment against him citing his former jeopardy and double jeopardy rights under ORS 131.525(1),[2] Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution. After briefing and oral argument, the trial court declined to dismiss the indictment. It ruled:

"We will find that the state has met its burden of proof to show that there was manifest necessity in declaring the

---

[1] The parties have not argued the correctness of that ruling in this proceeding, and we express no opinion on that issue.

[2] ORS 131.525(1) is, in part, a codification of the test of "manifest necessity" set forth in *United States v. Perez*, 22 US 579, 6 L Ed 165, 9 Wheat 579 (1824). *See State v. Cole*, 286 Or 411, 417-18, 595 P2d 466 (1979) (so stating). However, the parties did not develop a statutory argument under ORS 131.525(1) in either the trial court or in this court. Further, the trial court did not base any ruling on ORS 131.525(1). Thus, we limit our analysis to the parties' constitutional arguments.

mistrial that the ends of public justice could not be served by a continuation of the proceedings."

The trial court later made a number of findings and conclusions, among them that (1) the state had met is burden of proof to demonstrate that there was manifest necessity to declare a mistrial; (2) the state had not violated any pre-trial discovery rules with its mid-trial request to have the insurance investigator testify; (3) there had been no reason to believe that the prosecutor used the superior resources of the state to harass or achieve a tactical advantage over defendant; (4) the insurance investigator's anticipated testimony and report would be extremely probative of the core issue in the case and would not be substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence; and (5) this case was like the United States Supreme Court's decision in *Wade v. Hunter*, 336 US 684, 689, 69 S CT 834, 93 L Ed 974 (1949), in which the Court opined that "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."

The trial court scheduled a new trial date for both defendants. After the trial court denied defendant's motion to dismiss the indictment against him, defendant petitioned this court for a writ of mandamus.

## PARTIES' ARGUMENTS

The parties agree that the question for this court's determination is whether the trial court's mistrial ruling over defendant's objection met the constitutional standard of "manifest necessity." Defendant argues that he was entitled to complete his trial with the jury selected and that the state has not met its burden of demonstrating that the mistrial decision was consistent with the standard of "manifest necessity."

The state, for its part, acknowledges that "the ultimate question whether defendant was entitled to dismissal on jeopardy grounds is a legal one." However, the state first argues that the trial court—by ordering a mistrial—was simply exercising its discretion to address the prejudice to defendant resulting from the court's ruling admitting the

new evidence. Second, the state argues that defendant's objection to a mistrial was equivocal because defendant had suggested to the trial court that defendant would not be able to proceed with trial even if the court allowed a continuance.

## ANALYSIS

"Mandamus is an extraordinary remedy that may serve only to enforce a known, clear legal right." *Longo v. Premo*, 355 Or 525, 531, 326 P3d 1152 (2014). Although a writ of mandamus "shall not be issued in any case where there is a plain, speedy, and adequate remedy in the ordinary course of the law," ORS 34.110, defendant nevertheless contends that a writ should issue here because the right to appeal after a conviction would not vindicate his constitutional right to be free from a second prosecution for the same offense. Subject to defendant sustaining his constitutional claim, defendant is correct that mandamus relief is available to avoid a reprosecution. *See State ex rel Turner v. Frankel*, 322 Or 363, 376, 908 P2d 293 (1995) (so holding). Thus, the issue for our determination is whether defendant had a clear, legal right to dismissal of the state's indictment after the trial court had ordered a mistrial and discharged the original jury in this case.[3]

Defendant's motion to dismiss the indictment against him was based on former jeopardy under Article I, section 12, of the Oregon Constitution and double jeopardy under the Fifth Amendment of the United States Constitution.[4] Both provisions "provide, in somewhat different terms, that

---

[3] As noted, the state contends that the trial court properly exercised discretion in ordering a mistrial over defendant's objection. However, mandamus relief may be appropriate when "the trial court's decision amounts to 'fundamental legal error' or is 'outside the permissible range of discretionary choices'" available. *Lindell v. Kalugin*, 353 Or 338, 347, 297 P3d 1266 (2013) (quoting *State ex rel Keisling v. Norblad*, 317 Or 615, 623, 860 P2d 241 (1993)). As we will explain, the trial court's decision below amounted to fundamental legal error.

[4] Article I, section 12, of the Oregon Constitution provides:

"No person shall be put in jeopardy twice for the same offence [*sic*] ***."

The Fifth Amendment of the United States Constitution provides:

"No person shall *** be subject for the same offense to be twice put in jeopardy of life or limb[.]"

Neither party argues that those provisions have different meanings as applied here.

a defendant in a criminal case has a right not to be put in jeopardy twice for the same offense." *State v. Cole*, 286 Or 411, 419, 595 P2d 466 (1979). This court's practice has been to resolve such claims first under state law while giving proper weight to relevant United States Supreme Court opinions that we find persuasive. *See, e.g., id.* at 417-18 (applying state statute to jeopardy claim before analyzing under Supreme Court cases); *see also Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) ("proper sequence is to analyze the state's law," before reaching a federal constitutional claim). We have, in some instances, concluded that the state and federal provisions afford varying degrees of protection to a criminal defendant. *See State v. Kennedy*, 295 Or 260, 276-77, 666 P2d 1316 (1983) (acknowledging that Oregon law concerning retrial after prosecutor-induced mistrial not identical to federal law); *State v. Rathburn*, 287 Or 421, 431, 600 P2d 392 (1979) (Article I, section 12, barred reprosecution of defendant as result of bailiff's prejudicial remarks to jury); *State v. Brown*, 262 Or 442, 497 P2d 1191 (1972) (holding that Article I, section 12, requires consolidation of all charges known to prosecutor).

Thus, we analyze defendant's Article I, section 12, claim first and, in doing so, give proper weight to relevant United States Supreme Court opinions that we find persuasive. The general purpose and meaning of the federal double jeopardy bar has been cogently summarized by Justice Hugo Black:

> "The constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense[.]

> "* * * * *

> "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense, and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

*Green v. United States*, 355 US 184, 187-88, 78 S Ct 221, 2 L Ed 2d 199 (1957). This court has embraced a similar view regarding Article I, section 12, by holding that "a bar against prosecution must be derived from the constitutional objective to protect defendant against 'the harassment, embarrassment and risk of successive prosecutions for the same offense' and that '[i]t is not a sanction to be applied for the punishment of prosecutorial or judicial error.'" *Kennedy*, 295 Or at 273 (footnote omitted).

The dimensions of the guarantee against double jeopardy and the many issues that may arise when the state seeks to reprosecute a defendant are varied and complex. *See*, *generally* Wayne R. LaFave et al, 6 *Criminal Procedure* § 25 (4th ed 2015). Where, as here, a trial court declares a mistrial over a defendant's objection, that decision is examined against the standard of "manifest necessity." *United States v. Perez*, 22 US 579, 6 L Ed 165, 9 Wheat 579 (1824); *Arizona v. Washington*, 434 US 497, 98 S Ct 824, 54 L Ed 717 (1978); *see also Cole*, 286 Or at 419 (applying standard).

In *Cole*, this court held that the state had "sustained its burden to show that there was such a 'manifest necessity' as to justify the dismissal of the jury and avoid the bar of double jeopardy," when the trial judge in that case had become so ill that he was hospitalized. *Id.* at 424. In so holding, the court distinguished between two distinct kinds of necessity: (1) "physical necessity", and (2) the "necessity of doing justice" based on the duty of the court to "guard the administration of justice." *Id.* at 423. The court characterized the circumstance of the judge's illness as a "physical necessity" and noted that "there is nothing in the record to show that either the defendant or his attorney would have agreed to the continuation of the trial before any other judge." *Id.* at 425. Justice Linde, specially concurring, emphasized that the trial judge "became incapacitated after the jury was selected and sworn but before any testimony was taken." *Id.* at 426. His view was that, "[i]n a case in which witnesses have been examined and cross-examined, including perhaps the defendant himself," a mistrial "might be much more prejudicial" and, "when the defendant is prepared to continue with a new judge[, the state's burden] might arguably be greater." *Id.*

As noted, the United States Supreme Court first established the "manifest necessity" standard in *Perez*, an 1824 case where the Court held that the failure of a jury to agree on a verdict did not bar the state from retrying the defendant. At that point, the standard was undeveloped, requiring only the exercise of "standard discretion" consistent with the "ends of the public justice," a power, the Court nevertheless added, that "ought to be used with the greatest caution, under urgent circumstances[.]" *Perez*, 22 US at 580. In *Arizona v. Washington*, the Court explained:

> "The words 'manifest necessity' appropriately characterize the magnitude of the prosecutor's burden. * * * [But] it is manifest that the key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that the mistrial is appropriate."

434 US at 505-06. The Supreme Court has, moreover, often observed that the validity of each "manifest necessity" ruling depends on the unique circumstances that each case presents.[5] Such a standard, the Court has stated, "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial."[6] *Illinois v. Somerville*, 410 US 458, 462, 93 S Ct 1066, 35 L Ed 2d 425 (1973).

---

[5] *Arizona*, 434 US at 505; *Illinois v. Somerville*, 410 US 458, 462, 93 S Ct 1066, 35 L Ed 2d 425 (1973), *United States v. Jorn*, 400 US 470, 480, 91 S Ct 547, 27 L Ed 2d 543 (1971).

[6] Professor LaFave's commentary about the many factors that may be relevant in assessing whether a mistrial order is justified by "manifest necessity" is instructive:

"A substantial number of factors enter into the assessment of 'manifest necessity' on a fairly regular basis. They are (1) the source of the difficulty that led to the mistrial—*i.e.*, whether the difficulty was the product of the actions of the prosecutor, defense counsel, or trial judge, or were events over which the participants lacked control; (2) whether the difficulty could have been intentionally created or manipulated for the purpose of giving the prosecution an opportunity to strengthen its case; (3) whether the possible prejudice or other legal complications created by the difficulty could be 'cured' by some alternative action that would preserve the fairness of the trial; (4) whether the record indicates that the trial judge considered such alternatives; (5) whether any conviction resulting from the trial would inevitably be subject to reversal on appeal; (6) whether the trial judge acted during the 'heat of the trial

In addition to the authorities noted above, we also consider two United States Supreme Court cases that we find particularly relevant to our inquiry here: *Downum v. United States*, 372 US 734, 83 S Ct 1033, 10 L Ed 2d 100 (1963), and *United States v. Jorn*, 400 US 470, 480, 91 S Ct 547, 27 L Ed 2d 543 (1971).

In *Downum*, a trial court granted the state's request to discharge an impaneled jury after the state had allowed the jury to be selected and sworn even though one of its key witnesses was absent and had not been found. 372 US at 735. The trial court cited precedent, including *Wade*, for the proposition that "[a]t times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—when there is an imperious necessity to do so," but concluded that the circumstances presented did not pose such a necessity. *Id.* at 736. The Court observed that to not bar the subsequent prosecution of the defendant would allow the trial court to "exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." *Id.* at 738. *Downum* is similar to this case, in that the state did not identify a key witness until after the trial was underway, and the trial court ordered a mistrial over defendant's objection.

In *Jorn*, a plurality opinion, the trial court, *sua sponte*, discharged an impaneled jury to allow state witnesses to consult with their own attorneys because the trial court was unsure whether the witnesses had been adequately advised of their right against self-incrimination. According to the plurality, it was "apparent from the record

---

confrontation'; (7) whether the trial judge's determination rests on an evaluation of the demeanor of the participants, the 'atmosphere' of the trial, or any other factors that similarly are not amendable to strict appellate review; (8) whether the trial judge granted the mistrial solely for the purpose of protecting the defendant against possible prejudice; (9) whether the evidence presented by the prosecution prior to the mistrial suggested a weakness in the prosecution's case (*e.g.*, a witness had failed to testify as anticipated); (10) whether the jurors had heard enough of the case to formulate some tentative opinions; (11) whether the case had proceeded so far as to give the prosecution a substantial preview of the defense's tactics and evidence; and (12) whether the composition of the jury was unusual."

LaFave, 6 *Criminal Procedure* § 25.2(c) at 799-800.

that no consideration was given to the possibility of a trial continuance." *Jorn*, 400 US at 487. Concluding that the trial court's decision did not meet the "manifest necessity" standard, the plurality affirmed dismissal of the information on the ground of double jeopardy and barred a retrial of the defendant.

Although *Jorn* did not involve prosecutorial error, the Court nevertheless cited its holding in *Downum* and discussed the significance of the lack of preparedness by the government for trial in double-jeopardy cases. The plurality also emphasized the importance of a defendant being able to complete a trial with a jury that the defendant believed to be favorably disposed to his or her position:

> "The trial judge must recognize that lack of preparedness by the Government to continue the trial directly implicates policies underpinning both the double jeopardy provision and the speedy trial guarantee. *Cf. Downum v. United States*, 372 US 734 (1963). Alternatively, the judge must bear in mind the potential risks of abuse by the defendant of society's unwillingness to unnecessarily subject him to repeated prosecutions. Yet, in the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate."

*Jorn*, 400 US at 486.

In reaching its decision, the plurality rejected as unsubstantiated by the record the government's argument that the trial court had ordered a mistrial solely for the defendant's benefit. *Id.* at 483. The plurality also cited prior case law recognizing that the Double Jeopardy Clause does not always guarantee a single trial for a given offense, as in cases where reprosecution is necessary after a criminal defendant's conviction has been reversed on appeal. *Id.* at 484. However, the plurality differentiated between that circumstance and reprosecution after a mistrial by a trial court *sua sponte*:

> "For the crucial difference between reprosecution after appeal by the defendant and reprosecution after a *sua*

*sponte* judicial mistrial declaration is that, in the first situation, the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal. On the other hand, where the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal.'

"* * * * *

"Thus, where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error. In the absence of such a motion, the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings."

*Id.* at 484-86 (internal citations and footnotes omitted).

We find the reasoning of *Jorn* and *Downum* persuasive, and, therefore, we will give those cases proper weight in addressing the Article I, section 12, issue presented here. *See Cole*, 286 Or at 424 (applying "flexible standard of *Arizona*" and concluding that state "[not] required to show that no other judge is available to continue the trial" when mistrial ordered because trial judge ill in hospital).

With the above authority in mind, we now determine whether the state has met its burden of demonstrating that the trial court's mistrial order is consistent with the standard of "manifest necessity." The trial court concluded that the circumstances of this case justified a mistrial under the United States Supreme Court's decision in *Wade*, a position also adopted by the state on review. We disagree.

*Wade* involved a military court martial in wartime Germany of a United States soldier accused of rape. After the court martial had commenced, the commander of the Third Army concluded that the tactical situation of his command and its distance from the trial site prevented the trial from being completed within a reasonable timeframe. The

charges against the defendant were withdrawn and later reinstated for trial at a location more convenient for the witnesses. The Court concluded that there was "manifest necessity" for the reprosecution under the circumstances. *Wade*, 336 US 684. Later, in *Downum*, the Court stated that "the tactical problems of an army in the field were held [in *Wade*] to justify the withdrawal of a court-martial proceeding and the commencement of another one on a later day." *Downum*, 372 US at 736. We think that *Wade*—a case decided based on tactical problems posed in a war zone—is inapposite to this case where the state proceeded to trial without a key witness and the trial court, after declining to exclude the testimony of that witness, ordered a mistrial *sua sponte* over defendant's objection.[7]

As previously explained, whether a trial court ruling is consistent with the federal "manifest necessity" standard depends on the unique circumstances presented in that case. *Washington*, 434 US at 505; *Somerville*, 410 US at 462 ("manifest necessity" standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial"); *Jorn*, 400 US at 480. Similarly, we think that whether the "manifest necessity" standard is met under Article I, section 12, likewise depends on the circumstances of each individual case. After considering the unique circumstances here, two factors lead us to conclude that the trial court's mistrial order did not meet the "manifest necessity" standard.

First, the state mistakenly proceeded to trial in this case before identifying a key witness, Gunsolly, an insurance investigator who—according to the prosecutor—would testify that the fire that caused the victim's death was not accidental. The prospect of such testimony—raised well into the state's case-in-chief—went to the core of the case and necessarily affected the parties' theories and strategies. The record shows that that serious mistake created the issue of

---

[7] *Wade* might be most accurately characterized as a case where the test of "manifest necessity" was met based on the physical necessity of a retrial in a war zone. *See Cole*, 286 Or at 423 (distinguishing "physical necessity" from the "necessity of doing justice" based on the duty of the court to "guard the administration of justice").

prejudice that the trial court sought to address by allowing codefendant Golden's motion for a mistrial and *sua sponte* ordering a mistrial as to defendant. The record also shows that the state was solely responsible for that mistake. That factor weighs heavily in favor of defendant's constitutional argument. *See Downum*, 372 US at 734 (failure to bar subsequent prosecution of defendant when state allowed jury to be selected and sworn even though one of its key witnesses was absent would allow trial court to exercise "unlimited, uncertain, and arbitrary judicial discretion").

Second, it is significant that the state examined— and defense counsel cross-examined—eight witnesses for the state prior to the mistrial. That fact presents a significant potential for prejudice to defendant and an unfair advantage to the state. If the state is permitted to reprosecute defendant, it would then have an unfair opportunity to further prepare its witnesses based on their previous examination and cross-examination during the first trial. *See Cole*, 286 Or at 426 (Linde, J., concurring) (where "witnesses have been examined and cross-examined, including perhaps the defendant himself, the mistrial might be much more prejudicial," and the state's burden is arguably greater when defendant prepared to continue with new judge).

In this case, the record is clear that defendant wished to complete his trial with the jury selected, notwithstanding the prospect of new evidence or his codefendant's motion for a mistrial. Defendant's counsel stated to the court: "We don't want a mistrial. We like this jury; we like how we're doing." Defendant also personally stated to the court that he wanted to continue with the trial. The fact that defendant and his counsel believed that the jury was favorably disposed to his case and objected to a mistrial is an important consideration here. *See Jorn*, 400 US at 486 (judge "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate").

Thus, we hold, as a matter of law, that the trial court's mistrial order violated defendant's right to be free from a

second prosecution for the same offense under Article I, section 12.[8] Under the circumstances presented, the *sua sponte* mistrial ordered by the trial court over defendant's objection was outside the constitutional bounds of discretion and constituted legal error. We do not reach our holding today as a sanction for prosecutorial error, but rather to protect defendant against the harassment, embarrassment, and risk of successive prosecutions as guaranteed by Article I, section 12. *See Kennedy*, 295 Or at 272-73 (expressing constitutional objective of Article I, section 12).

We reject the state's first argument that the trial court's mistrial order was necessary to eliminate the potential prejudice to defendant attributable to the court admitting new evidence after prosecutorial error. We also reject the state's second argument that defendant's objection to a mistrial was equivocal because defendant suggested to the court that defendant would not be able to proceed with the trial even if the court allowed a continuance. The record does not support the state's argument. The record shows that defendant did not request a continuance or bring up the subject of a continuance when the court discussed with counsel the prejudicial effect on both defendants of admitting the new evidence. The state first raised the possibility of a continuance to address the problem. Defendant unequivocally took the position that the new evidence should not be admitted because the prejudice to defendant could not be effectively addressed by a continuance. Defendant stated that the nature of the new evidence was such—at that point in the trial—that "a continuance will not be the cure" in support of his argument to exclude the evidence. Defendant did not, however, state that he would not be able to proceed with the trial even if the court admitted the evidence. In addition, after a lengthy discussion about whether the prejudice to defendant could be effectively addressed, defendant told the court: "And just so we're clear, the last—we do not want a mistrial." The only reasonable inference that could be drawn from that statement is that, even if the trial court admitted the challenged evidence, defendant nevertheless wanted to proceed with the trial. In sum, the record shows

---

[8] As a result, we do not find it necessary to address defendant's federal constitutional claim.

that defendant clearly took the position that (1) the new evidence should not be admitted because—if admitted—the resulting prejudice to defendant could not be effectively cured; and (2) defendant objected to a mistrial. Defendant was entitled to make both arguments, and he did so.

## CONCLUSION

We conclude that the trial court's *sua sponte* mistrial order violated defendant's right to be free from a second prosecution for the same offense under Article I, section 12, of the Oregon Constitution. The trial court's mistrial order and the court's denial of defendant's motion to dismiss the indictment with prejudice constituted fundamental legal error. This court, therefore, will provide the mandamus relief requested by defendant to enforce a clear legal right. *Frankel*, 322 Or at 376 (mandamus relief available to avoid reprosecution when defendant's Article I, section 12, rights violated). We direct the issuance of a peremptory writ of mandamus requiring the trial court to dismiss the indictment with prejudice.

Peremptory writ of mandamus to issue.